Filed 2/21/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GILMORE BANK et al., | |
| Plaintiffs and Appellants, | G048053 |
| v. | (Super. Ct. No. 30-2011-00452056) |
| ASIATRUST NEW ZEALAND LIMITED as Trustee, etc., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge.  Reversed.

Hallstrom, Klein & Ward and David T. Ward for Plaintiffs and Appellants.

DiMascio & Berardo, Dianne DiMascio and David Berardo for Defendant and Respondent.

\*          \*          \*

Plaintiffs Gilmore Bank and Jay Cho seek to collect a $3.2 million judgment from judgment debtor, Cindy Dalrymple.[1]  Toward this end, they have sued Cindy, AsiaTrust New Zealand Limited — a New Zealand company (AsiaTrust), and other defendants for fraudulently transferring and sequestering Cindy's assets.

This appeal concerns the trial court's order granting nonresident defendant AsiaTrust's motion to quash service of summons for lack of personal jurisdiction.  The primary issue presented is whether the test for specific jurisdiction in tort cases requires the defendant to have expressly aimed its intentional conduct at the plaintiff.  We hold that California's specific jurisdiction test in tort cases is not so narrow or rigid.  Accordingly, we reverse the court's order.

FACTS

*The Underlying Judgment*

In 2008, Cindy sold her manufacturing company to plaintiff Cho.  Plaintiff Gilmore Bank financed Cho's purchase.  Within six months of the sale, the company's revenues dropped precipitously and it laid off all its workers and closed.

Cho commenced arbitration proceedings against Cindy for misrepresentation and other causes of action.

On the second day of the arbitration hearing (Jan. 12, 2010), Cindy formed the CD Private Retirement Trust (Cindy's Retirement Trust) and appointed her 25-year-old niece, Sonia, as the trustee.  The trust provides that the trustee is to pay Cindy $203,000 of trust income or capital every year during Cindy's lifetime.

_____

[1]  For ease of reference and to avoid confusion, we sometimes refer to Cindy Dalrymple and her niece, Sonia Jolene Dalrymple, by their first names.  We mean no disrespect.

2

The three-arbitrator panel awarded Cho approximately $3.2 million from Cindy. The arbitrators found that during the sale negotiations, Cindy made false and misleading statements to plaintiffs and failed to tell them that the company faced a significant loss of business and that its sales volume and profits would plummet.

In May 2010, the court entered a judgment of almost $3.3 million on the arbitration award in plaintiffs' favor against Cindy and her former company.

*Plaintiffs' Action Against Cindy for Fraudulently Transferring Her Assets*

In February 2011, plaintiffs sued Cindy, Sonia (as trustee of Cindy's Retirement Trust), five corporations, and a law firm for fraudulent transfers and other causes of action. (In this opinion we refer to Cindy, Sonia, and the defendant entities collectively as "the Dalrymple defendants.") Plaintiffs' complaint alleged that, at the start of the arbitration proceeding, Cindy owned assets valued at over $5 million, but during the proceeding, as her liability became clear, she frantically formed trusts and other entities, fraudulently transferred her assets to them in order to hinder plaintiffs from collecting their claims, and appointed Sonia as the trustee or manager of the newly formed trusts and entities. Plaintiffs further alleged that Cindy's Retirement Trust initially held $3 million in stocks and bonds (as well as a significant amount of cash and other assets), but, recently, $1 million of its assets had "disappeared." Plaintiffs further alleged that defendants knew that plaintiffs would satisfy their judgment from Cindy's assets, but defendants nonetheless fraudulently concealed and transferred Cindy's assets to hinder, delay, and defraud plaintiffs.

In June 2012, plaintiffs amended their complaint to name AsiaTrust (as trustee of the CD PRT NZ Trust) as a defendant.

3

*AsiaTrust's Motion to Quash Service for Lack of Personal Jurisdiction*

AsiaTrust (represented by the same attorneys who have represented the Dalrymple defendants in this litigation) moved to quash service of summons for lack of personal jurisdiction. The motion was supported by the declaration of Lauren Cherie Willis, a barrister and solicitor who is the general manager of AsiaTrust's parent company, Asiaciti Trust (Asiaciti). Willis declared the following:

Asiaciti and AsiaTrust are New Zealand companies that conduct all their business in New Zealand and have offices only in New Zealand. In June 2011, Willis was "introduced by email" to Sonia, as trustee of Cindy's Retirement Trust, "for the purpose of having AsiaTrust take title to an annuity that was to be issued by a Swiss insurance company."

AsiaTrust agreed to serve as trustee for a trust that would be created to hold the annuity. Willis drafted a deed of settlement for a trust (the New Zealand Trust) between AsiaTrust, as trustee, and Sonia (trustee of Cindy's Retirement Trust) as settlor and beneficiary. Willis e-mailed the deed of settlement to Sonia. Willis and Sonia exchanged fully executed copies of the deed of settlement via e-mail.

"Since approximately October 3, 2011, the [New Zealand Trust] has received annuity payments from the Swiss Insurance Company which have been distributed to [Cindy's] Retirement Trust pursuant to the terms of the Annuity. The distributions have been made via wire transfers from AsiaTrust's [bank account] to [Cindy's] Retirement Trust's bank in the United States."

Willis "did not travel to California to solicit, negotiate or execute the Deed of Settlement," has never met Sonia in person, and is not required to travel and has not traveled to California in connection with conducting business or administering the assets of the New Zealand Trust.

4

*Plaintiffs' Opposition to AsiaTrust's Motion to Quash Service*

In plaintiffs' opposition to AsiaTrust's motion, they argued AsiaTrust was subject to personal jurisdiction in California because it had received, managed, and disbursed funds to and from California, and had formed "a contract that it sent to California for execution, pursuant to which it sends regular payment to California, all as part of an on-going effort to sequester funds from Plaintiffs and hinder collection . . . ."

Plaintiffs' counsel's declaration and exhibits thereto evidence the following facts. Cindy, Sonia, David Berardo (counsel for the Dalrymple defendants), and plaintiffs are California residents. Cindy's Retirement Trust and its bank account are located in California. As of November 1, 2009 (two months before the creation of Cindy's Retirement Trust), Cindy's assets had totaled over $5 million and she had no debt.

Berardo was familiar with AsiaTrust. Over the years, he had consulted with AsiaTrust about the formation of various legal entities and had introduced people to AsiaTrust for that purpose.

In a June 2011 e-mail to AsiaTrust, Berardo wrote: "We have a new matter. We need to set up a NZ Trust to be settled by the trustee of a California [private retirement trust]. The form of the transaction is identical to the Elins [New Zealand private retirement trust]."

Berardo asked AsiaTrust to begin its due diligence on Sonia as soon as possible. He provided AsiaTrust with documents on Sonia, as trustee of Cindy's Retirement Trust. Willis and Berardo exchanged e-mails about Sonia's plan to contact Willis as part of Sonia's due diligence on Asiaciti.

In an e-mail, Sonia asked Willis for information concerning "the annuities you offer . . . ." Willis replied by e-mail to Sonia that it "was a pleasure to speak with you the other day." Willis attached "a document which outlines the advantages of [New

Zealand] as a trust jurisdiction," and stated that a New Zealand foreign trust is "a great entity" with tax advantages.

Willis also attached a draft trust deed for Sonia's and Berardo's review. In a subsequent e-mail, Willis attached an "updated" trust deed reflecting a change negotiated by Berardo. In an e-mail to Willis, Berardo attached an amendment to the trust deed that had been signed by Sonia and witnessed by Berardo, and asked Willis to have it countersigned.

Under the terms of the trust deed for the New Zealand Trust, the trust is irrevocable. The trust deed entitles AsiaTrust to remuneration for its services and to be indemnified out of the New Zealand Trust's assets against liabilities incurred as trustee. The trust deed empowers Sonia to carry out her fiduciary duties to Cindy (the beneficiary of Cindy's Retirement Trust) and to recommend to AsiaTrust that retirement benefits be paid directly to beneficiaries of Cindy's Retirement Trust.

Asiaciti billed Sonia (as settlor of the New Zealand Trust) $3,750 as an establishment fee and an additional $3,500 as an annual trustee fee. Sonia used funds from Cindy's Retirement Trust to pay $500,000, as well as initial fees, to the New Zealand Trust. The New Zealand Trust put the $500,000 into an interest-bearing client account.

Sonia liquidated over $2 million in stocks and bonds from Cindy's California accounts (held by Cindy's Retirement Trust) and wired the money to the New Zealand Trust. The New Zealand Trust bought a Swiss annuity for $2.5 million.

In an e-mail, Berardo instructed Willis to arrange to meet with the Swiss annuity company while she was in Zurich, Switzerland. Berardo stated the Swiss company had "issued a written binder confirming that it will issue an annuity to AsiaTrust as the owner and beneficiary." Berardo asked Willis to get a copy of the binder, to "confirm that AsiaTrust is the owner and beneficiary," and to circulate the binder at her earliest opportunity.

6

The Swiss annuity certificate reflects that (1) the New Zealand Trust is the owner and beneficiary of the annuity, (2) the insured person is Cindy Dalrymple, a resident of Tustin, California, (3) the annuity was purchased for $2.5 million, (4) the annuity pays about $67,500 every quarter, and (5) the annuity income is payable so long as Cindy lives. At the time the annuity was issued, Cindy was 55 years old.

In September 2011 e-mails between Sonia and Asiaciti, (1) Sonia instructed AsiaTrust to immediately wire transfer $70,000 to Cindy's Retirement Trust's bank account in California, (2) Willis asked Sonia to print a copy of the e-mail and sign and send it to Willis as soon as possible for Asiaciti's files, and (3) Asiaciti's legal counsel subsequently confirmed that the funds had been transferred.

In depositions, Sonia testified to the following. The September 2011 distribution of $70,000 from the New Zealand Trust went to Cindy. Sonia has e-mailed Willis to ask for money from the New Zealand Trust more than once (possibly two or three times), and the New Zealand Trust has each time wire transferred the money in response to Sonia's requests. The money received from the New Zealand Trust is used exclusively to disburse funds to Cindy or to pay legal fees. The wire transfers from the New Zealand Trust go to the California bank account of Cindy's Retirement Trust. Sonia anticipated she would request the next distribution from the New Zealand Trust sometime in 2013. She made such requests whenever the funds "in the accounts" were insufficient to meet Cindy's requests. All disbursements from the annuity are distributed to Cindy's Retirement Trust through the New Zealand Trust. The flow of money originates from the annuity, moves to the New Zealand Trust, then to Cindy's Retirement Trust, and ultimately to Cindy herself. This enables Sonia to make the retirement payments required of her as trustee. Sonia has spoken to Willis once or twice and has e-mailed Willis a "lot." Asiaciti sent Sonia an invoice (addressed to a California address) for establishing the New Zealand Trust and for its annual trustee fee, and later e-mailed Sonia an invoice

7

for a subsequent annual fee, which fees were paid from the $500,000 in the New Zealand Trust's fund.

*Court Rulings*

On December 3, 2012, the court granted plaintiffs' motion for a preliminary injunction to freeze the "defendants' assets," to restrain them from transferring any property, and to require them to repatriate to the United States all assets transferred to the New Zealand Trust and the Swiss annuity.

On December 12, 2012, a different judge granted AsiaTrust's motion to quash service of summons for lack of personal jurisdiction.

DISCUSSION

*General Legal Principles on Personal Jurisdiction*

California's long-arm statute authorizes its "courts to exercise jurisdiction over a foreign corporation to the fullest extent consistent with due process." (*Sanders v. CEG Corp.* (1979) 95 Cal.App.3d 779, 783; see Code Civ. Proc., § 410.10.) Consequently, California has personal jurisdiction over a nonresident defendant who "has such minimum contacts with the state that the assertion of jurisdiction does not violate '"traditional notions of fair play and substantial justice."'" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 (*Vons*).) The defendant's minimum contacts with the state must reasonably justify haling it into a California court to conduct a defense. (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 (*Pavlovich*).) Courts apply the minimum contacts test on a case by case basis, focusing on the *nature and quality* of the defendant's activities in the state or with state residents. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 474-475 (*Burger King*).)

8

Personal jurisdiction may be general or specific. If the defendant's contacts are substantial, continuous, and systematic, the defendant may be subject to California's *general* jurisdiction. (*Vons*, *supra*, 14 Cal.4th at p. 445.)

If general jurisdiction is not established, a nonresident defendant may still be subject to California's *specific* jurisdiction if a three-prong test is met. (*Vons*, *supra*, 14 Cal.4th at p. 446.) First, the defendant must have *purposefully availed* itself of the state's benefits. Second, the controversy must be *related to or arise out of* the defendant's contacts with the state. (*Ibid.*) Third, considering the defendant's contacts with the state and other factors, California's exercise of jurisdiction over the defendant must comport with *fair play and substantial justice*. (*Id.* at p. 447.)

The parties agree the sole issue here is whether AsiaTrust is subject to California's specific jurisdiction. Plaintiffs bear the burden of establishing that the first two requirements for specific jurisdiction have been met. (*Pavlovich*, *supra*, 29 Cal.4th at p. 273.) If plaintiffs do so, the burden shifts to AsiaTrust to show that California's exercise of jurisdiction would be unreasonable. Because the facts are undisputed, we decide the question of jurisdiction de novo. (*Ibid.*)

*Prong One of the Specific Jurisdiction Test: AsiaTrust Purposefully Availed Itself of Forum Benefits*

For purposes of the purposeful availment prong, the "United States Supreme Court has described the forum contacts necessary to establish specific jurisdiction as involving *variously* a nonresident who has 'purposefully directed' his or her activities at forum residents [citation], *or* who has 'purposefully derived benefit' from forum activities [citation], *or* '"purposefully avail[ed himself or herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,"'" *or* '"""deliberately" has engaged in significant activities with a State [citation] *or* has created "continuing obligations" between himself and residents of the

9

forum [citation].'" (*Vons*, *supra*, 14 Cal.4th at p. 446, italics added.)  This disjunctive language, along with the Supreme Court's rejection of mechanical or "'talismanic'" formulas (*id*. at pp. 450, 460), suggests that the above formulations describe *alternative*, but not mutually exclusive, tests for purposeful availment.

AsiaTrust, however, argues that in tort cases, the purposeful availment issue is determined exclusively by applying the "effects" test (also known as the "purposeful direction" test).  Furthermore, AsiaTrust interprets the effects test to require the defendant to have expressly aimed its intentional act at a plaintiff whom the defendant knows to be a resident of the forum state.[2]  To support these contentions, AsiaTrust relies primarily on federal district court rulings and a Ninth Circuit opinion — decisions that lack precedential value.  (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352 ["Decisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts"].)  For the reasons discussed below, we are unpersuaded by AsiaTrust's effort to read into purposeful availment law an inflexible dichotomy between tort and contract cases.

1.  *The effects test*

The effects test was established by the United States Supreme Court in *Calder v. Jones* (1984) 465 U.S. 783 (*Calder*).  (*Pavlovich*, *supra*, 29 Cal.4th at pp. 269-270.)  In *Calder*, Shirley Jones, "an entertainer whose television career was centered in California" (*Calder*, at p. 788), sued, among others, a reporter and an editor (who were

---

[2]  At the hearing on AsiaTrust's motion to quash service of summons, defense counsel argued that specific jurisdiction hinged on whether AsiaTrust purposely directed its activities at *plaintiffs*.  Later, the court stated, "But more than anything else, it looks like, to the extent [AsiaTrust] had any connection with California, it was with one of the [Dalrymple] defendants, and it didn't direct its activities in any way toward the plaintiffs, nor would it have reasonably been able to assume that its activities were in any way directed toward the plaintiffs."

10

both Florida residents) for libel in California in connection with a National Enquirer article (*id*. at pp. 785-786). The Florida defendants moved to quash service of process for lack of personal jurisdiction. (*Id.* at pp. 784-785.) The *Calder* court found California was "the focal point both of the story and of the harm suffered" and consequently held that jurisdiction over the Florida residents was proper "based on the 'effects' of their Florida conduct in California." (*Id.* at p. 789.)

In *Pavlovich*, a trade secrets misappropriation case, our Supreme Court held that the "*Calder* effects test requires intentional conduct expressly aimed at or targeting *the forum state* in addition to the defendant's knowledge that his intentional conduct would cause harm *in the forum*." (*Pavlovich*, *supra*, 29 Cal.4th at p. 271, original italics omitted, first and second set of italics added.) *Pavlovich* applied the effects test to conclude that, under the particular facts presented, California lacked personal jurisdiction over the defendant, a Texas resident who had posted on his Web site the plaintiff's confidential proprietary information. (*Id.* at pp. 266, 267, 273.) The plaintiff's principal place of business was California. (*Id.* at p. 266.) Its proprietary information enabled users to decrypt and copy DVD's containing motion pictures. (*Id.* at p. 267.) The court examined broadly whether the defendant's internet posting met the effects test (*id*. at p. 273), but ultimately concluded no evidence in the record suggested that the defendant's Web site targeted California, that any California resident ever visited the defendant's Web site, that the defendant knew the plaintiff's identity or that the plaintiff's primary place of business was California, or that the defendant expressly aimed his conduct to harm the motion picture industry in California or licensees of the plaintiff's proprietary information in California (*id.* at pp. 274-277).

Thus, contrary to AsiaTrust's insistence to the contrary, the effects test requires express aiming at the *forum* (not necessarily at the plaintiff). (*Vons*, *supra*, 14 Cal.4th at pp. 455, 458; see *Archdiocese of Milwaukee v. Superior Court* (2003) 112 Cal.App.4th 423, 440 (*Archdiocese of Milwaukee*) [effects test does not require defendant

11

to know identities of future victims].) The issue raised by AsiaTrust — i.e., whether the defendant's conduct affected the *plaintiff* — is relevant to the *second* prong of the specific jurisdiction test, i.e., whether the controversy is *related to or arises out of* the defendant's forum contacts. Yet, even as to this second prong, our Supreme Court has clarified that the "'forum contacts need not be directed at the plaintiff in order to warrant the exercise of specific jurisdiction.'" (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1068.)

Furthermore, the effects test is *not* the sole purposeful availment test used in tort cases.

### 2. *Purposeful availment tests in tort cases*

In *Vons*, a tort case, our Supreme Court applied the forum benefits test for purposeful availment, *not* the effects test. (*Vons*, *supra*, 14 Cal.4th 434.) There, Vons Companies, Inc. (Vons), the California cross-complainant, alleged negligence and other tort causes of action against a franchisor whose principal place of business was California (Jack-in-the-Box)[3] and several of Jack-in-the-Box's Washington-based franchisees. (*Id.* at pp. 440-442.) Our Supreme Court held that California had specific jurisdiction over the Washington franchisees because they had "purposefully availed themselves of benefits in the forum by reaching out to forum residents to create an ongoing franchise relationship." (*Id.* at p. 449.) The Washington franchisees had "purposefully availed themselves of the benefits of doing business with [Jack-in-the-Box]. They formed a substantial economic connection with this state. To require them to answer [Vons'] claim, as well, is not to allow a third party unilaterally to draw them into a connection with the state; rather, it was [the Washington franchisees] who established the connection." (*Id.* at p. 451.) Our Supreme Court recognized that Vons "was not a party to the franchise contract, and thus the claim is not on the contract . . . . This distinction,

---

[3]      Jack-in-the-Box was a division of the franchisor.

12

however, does not render the exercise of specific jurisdiction improper." (*Id.* at p. 452.) "The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts. That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum." (*Ibid.*)

Thus, the test for purposeful availment does not hinge mechanically on whether the plaintiff's claim sounds in tort or contract. Rather, a court must apply "'a "highly realistic" approach'" on a case by case basis and select the most appropriate test for purposeful availment based on the particular facts presented. (*Vons*, *supra*, 14 Cal.4th at p. 450; see *Pavlovich*, *supra*, 29 Cal.4th at p. 268.) Indeed, because California's long-arm statute "'manifests an intent to exercise the broadest possible jurisdiction'" (*Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 535), its courts may apply the purposeful availment test most conducive to establishing specific jurisdiction over a defendant in a particular case, consistent with due process.

AsiaTrust relies on *Schwarzenegger v. Fred Martin Motor Co.* (9th Cir. 2004) 374 F.3d 797 (*Schwarzenegger*) for the proposition that courts must apply the effects test in tort cases. There, the defendant, an Ohio car dealership, ran advertisements in a local Ohio newsletter that included a photograph of the plaintiff, Arnold Schwarzenegger, a California resident. (*Id*. at p. 799.) Schwarzenegger sued the dealership for infringing his right of publicity. (*Ibid.*) As in *Vons* and *Pavlovich*, the defendant's sole contact with California was a publication created in another state. The Ninth Circuit applied a "purposeful direction analysis" (*id*. at p. 802) to conclude that the dealership's advertisement "was not expressly aimed at California" (*id*. at p. 807). The Ninth Circuit stated that the purposeful direction test "is most often used in suits sounding in tort" (*Schwarzenegger*, at p. 802), but did not state that the purposeful direction test is the only one used in tort cases.

13

In *Calder*, *Pavlovich*, and *Schwarzenegger*, the respective defendants' only direct contact with California was the *effect* in California of a nationally or internationally disseminated publication created by the defendants in another state. Consequently, the only purposeful availment test which could potentially apply to establish California's specific jurisdiction was the effects test. The effects test was not meant to restrict a court's jurisdictional reach, but rather to serve as an additional tool for a forum to exercise constitutional jurisdiction.

3. *AsiaTrust's conduct satisfies several purposeful availment tests*

Here, as in *Vons*, AsiaTrust has a contractual relationship with its codefendants, who are California residents. Also as in *Vons*, AsiaTrust's contacts with its codefendants need not have been wrongful. "In any personal jurisdiction case we must evaluate all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." (*Yahoo! Inc. v. La Ligue Contre Le Racisme* (9th Cir. 2006) 433 F.3d 1199, 1207.) Furthermore, AsiaTrust's alleged liability as a transferee of a fraudulent conveyance is "based not upon tort but upon quasi-contract." (*United States v. Neidorf* (9th Cir. 1975) 522 F.2d 916, 918.) "'A quasi contractual obligation is created by the law for reasons of justice, without any expression of assent . . . .'" (*Ibid.*)

We conclude it is unnecessary to apply the effects test here. Instead, we apply several other purposeful availment formulas, any one of which is sufficient to meet the first requirement for specific jurisdiction. The undisputed facts show Asiatrust (1) created continuing obligations between itself and California residents, (2) purposefully directed (and continues to direct) its activities towards California residents, and (3) purposefully derived (and continues to derive) benefits from its activities in California. AsiaTrust conducted due diligence on California resident Sonia, the trustee of Cindy's Retirement Trust. AsiaTrust sent promotional materials to Sonia and otherwise marketed

14

to her the advantages of forming a New Zealand trust. AsiaTrust drafted the trust contract, negotiated the contractual terms with California residents Sonia and Berardo, and amended the contract. Sonia signed the amended contract, witnessed by Berardo, in California. AsiaTrust communicated by e-mail and telephone with Sonia and Berardo in California. AsiaTrust has invoiced Sonia in California for fees owed to AsiaTrust. AsiaTrust has received funds from Cindy's Retirement Trust in California and from a Swiss annuity that insures California resident Cindy. AsiaTrust has followed Berardo's instructions concerning the ownership of the Swiss annuity. AsiaTrust has wire transferred funds to Cindy's Retirement Trust's bank account in California in accordance with Sonia's instructions. Essentially, AsiaTrust has received compensation for accepting, investing, managing, disbursing, and shielding the assets of Cindy, a California judgment debtor, in a scheme that contemplates an ongoing contractual relationship for Cindy's lifetime.

AsiaTrust stresses that Willis never visited California. But "in this age of telecommunications, fax machines, and rapid mail services it is possible to [solicit and negotiate investments] without face-to-face meetings in any jurisdiction." (*Checker Motors Corp. v. Superior Court* (1993) 13 Cal.App.4th 1007, 1017.) It "is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." (*Burger King*, *supra*, 471 U.S. at p. 476.) "While any single telephone call or piece of correspondence might not be enough to satisfy the 'minimum contacts' requirement, there is much more in this case. Here there was a veritable 'latticework' of contacts linking [AsiaTrust] and the State of California: not one but many calls and other communications to California during the negotiations. The execution in California of the legal documents which formed the arrangement . . . . A continuing stream of payments from [AsiaTrust] to California." (*Id.* at p. 1018.) A continuing receipt by AsiaTrust of compensation from the California

15

trustee of a California trust. AsiaTrust's acceptance from the California trust of money which AsiaTrust invested as directed by the California trustee and a California lawyer.

Finally, the underlying rationale of all the purposeful availment tests is that "it is fair to subject defendants to specific jurisdiction, because their forum activities should put them on notice that they will be subject to litigation in the forum." (*Vons*, *supra*, 14 Cal.4th at p. 446.) Here, the indemnity and lien clause in the trust deed for the New Zealand Trust evidences AsiaTrust's awareness of the inherent litigation risks of its contacts with California residents Cindy, Sonia, and Berardo.

Plaintiffs have met their burden to demonstrate that AsiaTrust's contacts meet the purposeful availment prong of the specific jurisdiction test.

*Prong Two of the Specific Jurisdiction Test: A Substantial Connection Exists Between Plaintiffs' Claims and AsiaTrust's Forum Contacts*

The second prong of the specific jurisdiction test requires that the controversy relate to or arise out of the defendant's contacts with the forum. The question is whether the plaintiff's causes of action arose out of or had a substantial connection with a relationship the defendant purposefully established with the forum state. (*Vons*, *supra*, 14 Cal.4th at p. 448.) "[T]he cause of action must arise out of an act done or transaction consummated in the forum . . . ." (*Ibid.*) Stated another way, there must "be a substantial nexus or connection between the plaintiff's cause of action and the defendant's forum contacts . . . ." (*Id.* at p. 453.) "[T]he 'arising out of or relating to' standard is in the disjunctive, and is intended as a relaxed, flexible standard . . . ." (*Id.* at p. 455.)

In *Vons*, our Supreme Court concluded Vons' counterclaims against the Washington franchisees bore a substantial relationship to the franchisees' contacts with California, in part because Vons' counterclaims arose out of the franchisees' contractual relationship with Jack-in-the-Box. (*Vons*, *supra*, 14 Cal.4th at p. 457.) Our Supreme

16

Court emphasized that the lack of a relationship between Vons and the franchisees was *not* "critical in determining whether the claim was sufficiently related to the forum contacts to permit the exercise of specific jurisdiction in California" because "the defendant's forum activities need not be directed at the *plaintiff* in order to give rise to specific jurisdiction." (*Ibid.*) "The United States Supreme Court has stated more than once that the nexus required to establish specific jurisdiction is between the defendant, *the forum*, and the litigation [citations] — not between the plaintiff and the defendant." (*Id.* at p. 458.) Nor is it necessary that the defendant's forum contacts have proximately caused the injury to the plaintiff. "The United States Supreme Court long ago rejected the notion that personal jurisdiction might turn upon mechanical tests such as a proximate cause test." (*Id.* at p. 463.) Instead, the high court "has spoken of a *relationship* between the cause of action and the contacts in the forum, and has used relatively broad terms to describe the necessary relationship." (*Id.* at p. 468.) "[T]he central issue presented by a motion to quash for lack of specific jurisdiction [is] whether the defendant's forum contacts and the plaintiff's claim are related sufficiently so that it is *fair* to subject the defendant to jurisdiction in the forum." (*Id.* at p. 469.) Thus, personal jurisdiction is fundamentally a matter of "relationship and fairness," and answers are rarely ""''"written 'in black and white.'"''" (*Id.* at p. 475.)

Here, the New Zealand Trust is the instrumentality by which the Dalrymple defendants have transferred Cindy's assets out of plaintiffs' reach and which enables Cindy to continue to enjoy a substantial income from her transferred assets. Although Cindy's assets are central to plaintiffs' lawsuit against her, half of her assets reside in an irrevocable trust or Swiss annuity in AsiaTrust's possession or under its control. This is a sufficient nexus to fairly subject AsiaTrust to California's jurisdiction.

17

*Prong Three of the Specific Jurisdiction Test: California's Exercise of Personal Jurisdiction over AsiaTrust is Fair and Reasonable*

"In assessing fairness, we consider (1) the burden on [AsiaTrust] of defending in California, (2) California's interests, (3) [plaintiffs'] interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) '"the shared interest of several States in furthering fundamental substantive social policies."' [Citations.] [AsiaTrust] bears the burden of presenting a 'compelling case' that jurisdiction would be unreasonable.'" (*Archdiocese of Milwaukee*, *supra*, 112 Cal.App.4th at pp. 442-443 [quoting a U.S. Supreme Ct. opn. & a Cal. Supreme Ct. opn.].)[4]

To require AsiaTrust to defend itself in California would not impose an unreasonable burden. Although AsiaTrust argues that a more "stringent" reasonableness test applies because it is a foreign national, "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." (*Sinatra v. National Enquirer, Inc.* (9th Cir. 1988) 854 F.2d 1191, 1199.) In fact, Willis traveled to Europe and conducted business in Switzerland on Cindy's behalf. Cost is presumably not a factor for AsiaTrust since it has a first priority lien on the assets of the New Zealand Trust for indemnification purposes. Berardo's law firm in Los Angeles represents AsiaTrust, apparently pursuant to the indemnity and lien clause in the trust deed. The New Zealand Trust in this case is not the first trust AsiaTrust has formed and managed for Berardo's clients. Furthermore, we '"examine the burden on the defendant in light of the corresponding burden on the plaintiff."' (*Ibid.*) "It presents as much of a burden for [plaintiffs] to litigate in [New Zealand] as it does for [AsiaTrust] to litigate in

---

[4]     AsiaTrust relies on the Ninth Circuit's seven-factor reasonableness test set forth in *Dole Food Co., Inc. v. Watts* (9th Cir. 2002) 303 F.3d 1104, 1114, continuing a pattern in its respondents' brief of relying on Ninth Circuit and federal district court opinions.

California." (*Ibid.*) In addition, the "factor of conflict with the sovereignty of the defendant's state 'is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court.'" (*Ibid.*)

As to the other factors, AsiaTrust "concedes that California has an interest in adjudicating the fraudulent transfer dispute between [plaintiffs] *and the Dalrymple Defendants*," but contends California has "little, if any, interest in adjudicating a dispute between [plaintiffs] *and AsiaTrust* — an innocent third party that has not directed any activity at [plaintiffs] and has neither sought nor solicited business in California." Irrespective of the accuracy of AsiaTrust's characterization of itself, California has a strong interest in enforcing its judgments.

Plaintiffs have an obvious interest in collecting the $3.3 million judgment entered against Cindy and her former company by a California court over three and one-half years ago. AsiaTrust does not even mention this factor.

Because plaintiffs and the Dalrymple defendants are located in California, a California court can provide the most efficient conflict resolution. AsiaTrust quotes *Panavision Intern., L.P. v. Toeppen* (9th Cir. 1998) 141 F.3d 1316, 1323, for the proposition that this factor is "no longer weighed heavily," but omits *Panavision's* reasoning that geographical location is no longer critical "given the modern advances in communication and transportation." (*Ibid*.)

Finally, New Zealand and California share an interest in enforcing judgments, strengthening respect for judicial systems, and promoting cooperation among sovereign nations. AsiaTrust does not mention this factor.

In sum, AsiaTrust has failed to make a compelling case that California's exercise of specific jurisdiction would be unfair and unreasonable. (Indeed, AsiaTrust failed below to argue or even mention this third prong in its initial written motion to quash and instead raised the issue in its reply to plaintiffs' opposition.) Under the particular circumstances of this case and taking into account modern telecommunications

19

and transportation, we conclude California's exercise of personal jurisdiction over AsiaTrust is both fair and reasonable.

## DISPOSITION

The order granting the motion to quash is reversed and the court is directed to enter a new order denying the motion.  Plaintiffs are entitled to their costs on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.