Filed 8/12/16  Young v. Velocity Trade CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| KURT YOUNG, | |
| Plaintiff and Appellant, | G052138 |
| v. | (Super. Ct. No. 30-2014-00747226) |
| VELOCITY TRADE LLC et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Frederick P. Aguirre, Judge.  Affirmed.

theDewberryfirm, Robert H. Dewberry; Phillips Lytle and Robert V. Cornish, Jr., for Plaintiff and Appellant.

Law Offices of Richard A. Marcus and Richard A. Marcus for Defendants and Respondents.

\*          \*          \*

Plaintiff Kurt Young appeals from the trial court's orders granting the motions of defendants Velocity Trade LLC (Velocity) and Advanced Markets LLC (AM) to quash service of summons of his derivative complaint for lack of personal jurisdiction. He contends the court erred in finding it did not have general jurisdiction over AM and that neither AM nor Velocity had sufficient contacts to support specific jurisdiction. We affirm the orders.

I

FACTS AND PROCEDURAL BACKGROUND

In January 2008, Melody Phan and her husband Marc Wallack incorporated Wal Capital USA, a California Limited Liability Corporation (WC California) and operated it from Orange County, California. Plaintiff, a resident of Sedona, Arizona, is an individual who purchased a $50,000 membership interest in WC California.

Six months after incorporating WC California, Phan and Wallack incorporated Wal Capital, S.A. in Costa Rica (WC Costa Rica) and listed its principal address as being in Switzerland. Phan later contacted Velocity to open a foreign currency exchange (Forex) trading account for WC Costa Rica.

Velocity is "a Delaware limited liability company with its principal place of business . . . in Toronto, Ontario, Canada" and a satellite support office in New York. It is "an introducing broker, provid[ing] introductory contacts nationwide when requested from time to time." In such capacity, Velocity's sole role in this action was to introduce WC Costa Rica to AM, which "provides dealer services for certain participants in the Forex trading marketplace." Velocity's communications with Phan "were limited to: (i) emails relating to the opening of the WC Costa Rica account; (ii) the initial funding A[M] . . . should expect for the account; and (iii) commissions/referral fee to be paid to Velocity for the introduction." Velocity did not require Phan to complete any forms.

AM is a limited liability company with its principal place of business in North Carolina. At all relevant times, AM "provided trading platform and dealer services

for retail and institutional traders and firms participating in trading in the area of . . . [Forex] nationwide." California clients comprised only a very small percentage of AM's total aggregate revenues and accounts.

Velocity referred WC Costa Rica to AM in December 2008. Thereafter, AM "caused [a Forex] account to be opened for and on behalf of account for WC Costa Rica solely for its trading operations."

AM provided Pham with all of the necessary account documents. The instructions for opening a corporate Forex account direct Phan to read and sign the agreement and other necessary forms, and to send them to an address in Florida. The document also advised that funds must be sent to the same Florida address and that amounts over $10,000 must be wired to a bank located North Carolina.

The customer trading agreement states it is to "be governed by, and construed in accordance with, the laws of the State of Florida without regard to the choice-of-law provisions thereof" and that customer agrees to Florida's jurisdiction in any action or proceeding arising out of the agreement. Phan signed the agreement, acknowledging AM is "a company organized under the laws of the State of Florida" and that the agreement was between AM and WC Costa Rica. The agreement does not state where she signed it.

On the documents, Phan identified Costa Rica as WC Costa Rica's place of incorporation, Switzerland as its principal place of business and origin with a banking address there, and herself and Wallack as its authorized officers. According to plaintiff counsel, when asked for "information for an offshore banking institution, given that [WC] Costa Rica as an offshore entity could not have a banking presence in the United States[,] Phan provided account information for a bank in Turkey." WC Costa Rica's letterheads indicate it has addresses in Switzerland and Costa Rica.

From 2008 to 2010, AM provided a trading platform and Forex trading dealer services to WC Costa Rica. The initial funding for WC Costa Rica occurred

3

through a wire transfer from a non-U.S. bank. AM also processed small incremental wire transfers from WC California to WC Costa Rica as part of its services to the latter.

In September 2014, plaintiff filed a derivative complaint against Velocity and AM for aiding and abetting a breach of fiduciary duty, conversion, and corporate waste, as well as negligent supervision and breach of contract. Plaintiff alleged Velocity and AM failed to conduct sufficient due diligence regarding WC Costa Rica or to adequately supervise the account, resulting in plaintiff's inability "to redeem his membership interests" in WC California, the value of which "has plummeted."

Velocity and AM filed motions to quash service of the summons and complaint, supporting it with the declarations of their principals. Plaintiff opposed the motion, supported by the declaration of his attorney and attached exhibits.

The trial court issued a tentative ruling granting both motions. It found it had no general jurisdiction over AM (plaintiff made no claim of general jurisdiction over Velocity) because "there is no evidence that AM['s] small percentage of California clients represents a substantial amount of business or systematic or continuous contacts with California." Regarding specific jurisdiction, the court determined Velocity's communications with Phan as the introducing broker to AM did not show purposeful availment of California benefits and did not relate to plaintiff's claims. As to AM, the communications with Phan, while more than Velocity's, were "not directed at California, systemic or continuous, or part of a purposeful availment of the benefits of California. The transfer activity was at the behest of a customer and not a purposeful action taken by AM[]. And the communications were not an attempt to benefit from California, but to service the account of WC Costa Rica by communicating with its principals."

At the hearing on the motions, plaintiff argued *Gilmore Bank v. AsiaTrust New Zealand, Ltd.* (2014) 223 Cal.App.4th 1558 (*Gilmore*) supported a finding of jurisdiction over both defendants. The court ordered further briefing. It subsequently rejected plaintiff's claim that the communications between AM and Phan regarding the

4

wire transfers should have made AM aware "that something was not right about how Phan and Wallack were operating WC Costa Rica – and how they were using WC California's money. This is [p]laintiff's claim of liability against AM[]. But, even if adequately evidenced, liability alone does not create jurisdiction." The court also distinguished *Gilmore*, noting "the asserted contacts by [d]efendants with California are not close to the 'latticework' of contacts described [in that case]."

II

DISCUSSION

*A. Pertinent Law and Standard of Review*

"California has personal jurisdiction over a nonresident defendant who 'has such minimum contacts with the state that the assertion of jurisdiction does not violate "'traditional notions of fair play and substantial justice.'"'" [Citation.] The defendant's minimum contacts with the state must reasonably justify haling it into a California court to conduct a defense. [Citation.] Courts apply the minimum contacts test on a case-by-case basis, focusing on the *nature and quality* of the defendant's activities in the state or with state residents. [¶] Personal jurisdiction may be general or specific. If the defendant's contacts are substantial, continuous, and systematic, the defendant may be subject to California's *general* jurisdiction. [Citation.] [¶] If general jurisdiction is not established, a nonresident defendant may still be subject to California's *specific* jurisdiction if a three-prong test is met. [Citation.] First, the defendant must have *purposefully availed* itself of the state's benefits. Second, the controversy must be *related to or arise out of* the defendant's contacts with the state. [Citation.] Third, considering the defendant's contacts with the state and other factors, California's exercise of jurisdiction over the defendant must comport with *fair play and substantial justice*. [¶] The parties agree the sole issue here is whether [defendants are] subject to California's specific jurisdiction. Plaintiffs bear the burden of establishing that the first

5

two requirements for specific jurisdiction have been met. [Citation.] If plaintiffs do so, the burden shifts to [defendants] to show that California's exercise of jurisdiction would be unreasonable." (*Gilmore, supra*, 223 Cal.App.4th at pp. 1567-1568.)

"When the evidence of jurisdictional facts is not in dispute, the issue whether the defendant is subject to personal jurisdiction is a legal question subject to de novo review. [Citation.] When evidence of jurisdiction is in dispute, we accept the trial court's resolution of factual issues, draw all reasonable inferences in support of the trial court's order, and review the trial court's determination of factual issues for substantial evidence. [Citations.] 'The ultimate question whether jurisdiction is fair and reasonable under all of the circumstances, based on the facts which are undisputed and those resolved by the court in favor of the prevailing party, is a legal determination warranting our independent review.'" (*Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 17.)

### B. General Jurisdiction over AM

Plaintiff contends the court failed to address general jurisdiction over AM. He is mistaken. The court discussed this issue in detail in its initial tentative ruling. Because the parties did not further argue the issue in their supplemental points and authorities, it was sufficient for the court to merely declare AM's contacts with California were not "systematic or continuous" in its supplemental ruling.

Plaintiff maintains the court had jurisdiction over AM because "[t]he relative percentage of a company's business that is derived from a particular forum is not dispositive." As an example, he cites *Provident Nat. Bank v. California Federal Sav. & Loan Ass'n* (3d Cir. 1987) 819 F.2d 434 (*Provident*). There, the defendant was a California bank with no office and only a small number of customers in Pennsylvania. But it maintained a "'zero-balance' arrangement" with a Pennsylvania bank, which notified the defendant "every day of the total amount of checks cleared through the

6

account that day" and to which the defendant wired "transfers of funds for that amount . . . the same day." (*Id*. at p. 436.)

According to plaintiff, *Provident* "concluded that Pennsylvania had general jurisdiction over the bank" "[d]espite the small percentages." But he omits a significant part of *Provident*'s analysis. In holding that general jurisdiction existed over the California defendant in Pennsylvania, despite the small quantity of business performed in the state, *Provident* cited the facts showing the contacts the California defendant had with the forum were "*daily . . . continuous and [a] central*" part of the "*bread and butter*" of the defendant's business. (*Provident, supra*, 819 F.2d at p. 438, italics added.) *Provident* also deemed the defendant to have admitted to conducting continuous business in Pennsylvania. (*Id*. at p. 438.)

Here, unlike in *Provident*, there was no evidence AM had daily, continuous contact with California or that contacts with California were central to AM's business or part of its "bread and butter." (Cf. *Provident, supra*, 819 F.2d at p. 438.) Contrary to plaintiff's claim, the declaration of AM's CEO, Anthony Brocco, submitted in support of AM's motion to quash, does not establish "AM had a substantial number of customers in California [or that it] generated substantial revenues from those customers." Rather, it showed that the percentage of total annual revenue from AM's California clients from 2008 to 2010 were, respectively, 0.02, 0.35 and 0.05 and that over its entire operating period, California clients comprised only 2.2 percent of AM's accounts.

The trial court did not err in concluding AM's small percentage of California clients was insufficient for it to exercise general jurisdiction over it.

C. *Specific Jurisdiction*

     1. *Purposeful Availment*

Plaintiff contends AM and Velocity purposely availed themselves of California benefits because they "conduct[ed] business, by telephone, mail and email,

with a company owned and managed from California" by California residents Phan and Wallack. But such contacts alone are insufficient to establish that defendants purposefully availed themselves of California's benefits. (*Edmunds v. Superior Court* (1994) 24 Cal.App.4th 221, 234 (*Edmunds*) [mere facts that Hawaii attorney representing California resident in Hawaii on a Hawaii matter "came to California, made phone calls and wrote letters to and from this state, and accepted payment from a California client, do not establish purposeful availment of the benefits and protections of California law"]; *Sher v. Johnson* (9th Cir. 1990) 911 F.2d 1357 (*Sher*) [contacts between a California client and the Florida law firm representing him consisting solely of telephone calls, mailings, and three visits by a Florida lawyer to California to visit the client were not, by themselves, sufficient connections with California to establish purposeful availment]; *Sawtelle v. Farrell* (1st Cir. 1995) 70 F.3d 1381, 1391, 1392 [contacts by Florida and Virginia law firms and attorneys with New Hampshire clients "consisting primarily of written and telephone communications with the clients in the state where they happened to live" were insufficient by themselves to show defendants had purposely availed themselves of New Hampshire law; "more is required"]; cf. *Trinity Industries, Inc. v. Myers & Associates, Ltd*. (5th Cir.1995) 41 F.3d 229, 230-231 [Illinois law firm sued by a Texas client had purposefully availed itself of privileges of doing business in Texas by extended representation of the client in at least 40 matters, including a court appearance in the forum].)

Although the above cases involve out-of-state attorneys representing California clients on an out-of-state matter, we see no reason why their holdings should not apply here. By communicating with Phan and Wallack via telephone, mail and e-mail as part of their normal course of providing services to their client, WC Costa Rica, Velocity and AM did not thereby purposely avail themselves of California's benefits.

We do not disagree that "[c]ontact with the forum state by telephone or mail *may* furnish the necessary minimum contacts essential for the exercise of

8

jurisdiction." (*Brown v. Watson* (1989) 207 Cal.App.3d 1306, 1313, italics added (*Brown*).) But "[o]rdinarily, the word 'may' connotes a discretionary or permissive act." (*Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433.) "In determining the propriety of personal jurisdiction, 'the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.'" (*Brown*, at p. 1314.)

Cases finding specific jurisdiction based on purposeful availment generally do so on the basis that the defendant "reached out to the [plaintiff's] home forum" (*Newsome v. Gallacher* (10th Cir. 2013) 722 F.3d 1257, 1281) in some manner *in addition to* written or telephone communications with a California resident. For example, *Sher* ultimately concluded the Florida law firm was subject to specific jurisdiction because it purposefully availed itself of the benefit of California law when it took a deed of trust on Sher's home in order to secure payment for legal services. (*Sher, supra*, 911 F.2d at p. 1363.) The authorities cited by plaintiff are to the same effect.

As with the above cases, *Brown, supra*, 207 Cal.App.3d 1306, involved out-of-state attorneys being sued by a resident of the forum state for legal malpractice. *Brown* concluded the Texas attorney-defendants had "purposefully availed themselves of the privilege of conducting activities in California by their decision to represent [the plaintiffs] and their subsequent conduct." (*Id*. at p. 1314.) In addition to telephonic and written correspondence with the plaintiffs, the Texas attorneys had contacts with the plaintiffs "personally" for a four-year period; the location of "[m]aterial and information necessary for prosecution of the action . . . were in California," and the defendants' "fee was to be paid through a fee-splitting arrangement with the California attorneys." (*Ibid.*)

In *Edwards v. Pulitzer Pub.* (N.D.Cal. 1989) 716 F.Supp. 438, 440, a Missouri newspaper solicited the California plaintiff by calling him to induce him to consent to an interview in Missouri and later sending him a letter "promis[ing] to set the record straight" following plaintiff's claims of misrepresentations. Similarly, in *West Corp. v. Superior Court* (2004) 116 Cal.App.4th 1167, a telemarketer solicited the

9

California plaintiff by making an "upsell"[1] of a separate product to a California resident who had called to buy an advertised product. (*Id*. at p. 1176.) And, in *Hall v. LaRonde* (1997) 56 Cal.App.4th 1342, although the plaintiff reached out and initiated contact with the defendant in New York, the defendant "reached back to California." "The record shows that LaRonde's contacts with California consisted of more than simply purchasing a software module from Hall. LaRonde worked with Hall to integrate the module into LaRonde's software package. Even after the initial adaptation was finished, LaRonde continued to work with Hall to modify the module for new and existing software. In addition, the contract contemplated that LaRonde would make continuing royalty payments to Hall. Thus, LaRonde created a '"continuing obligation[]"' between himself and a resident of California" sufficient to establish purposeful availment. (*Id*. at p. 1347.)

*Gilmore* also involved more than mere communications by telephone, e-mail, and letters. (*Gilmore, supra*, 223 Cal.App.4th at p. 1572.) "The undisputed facts show AsiaTrust (1) created continuing obligations between itself and California residents, (2) purposefully directed (and continues to direct) its activities towards California residents, and (3) purposefully derived (and continues to derive) benefits from its activities in California. AsiaTrust conducted due diligence on California resident Sonia, the trustee of Cindy's Retirement Trust[, a California trust] . . . [,] sent promotional materials to Sonia and otherwise marketed to her the advantages of forming a New Zealand trust. AsiaTrust drafted the trust contract, negotiated the contractual terms with California residents Sonia and Berardo [the California attorney for Sonia, and Cindy, a California resident and the creator of Cindy's Retirement Trust], and amended the contract. Sonia signed the amended contract, witnessed by Berardo, in California. AsiaTrust communicated by e-mail and telephone with Sonia and Berardo in California.

---

[1] "An 'up-sell' is a 'sales pitch for additional products or services' made to a customer calling to place an order." (*Dish Network Corp. v. Arch Specialty Ins. Co*. (10th Cir. 2011) 659 F.3d 1010, 1022, fn. 9.)

10

AsiaTrust has invoiced Sonia in California for fees owed to AsiaTrust. AsiaTrust has received funds from Cindy's Retirement Trust in California and from a Swiss annuity that insures California resident Cindy. AsiaTrust has followed Berardo's instructions concerning the ownership of the Swiss annuity. AsiaTrust has wire-transferred funds to Cindy's Retirement Trust's bank account in California in accordance with Sonia's instructions. Essentially, AsiaTrust has received compensation for accepting, investing, managing, disbursing, and shielding the assets of Cindy, a California judgment debtor, in a scheme that contemplates an ongoing contractual relationship for Cindy's lifetime." (*Ibid.*)

In holding these contacts with California sufficient to meet the purposeful availment requirement, *Gilmore* acknowledged, "'While any single telephone call or piece of correspondence might not be enough to satisfy the "minimum contacts" requirement, there is much more in this case. Here there was a veritable "latticework" of contacts linking [AsiaTrust] and the State of California: not one but many calls and other communications to California during the negotiations. The execution in California of the legal documents which formed the arrangement . . . . A continuing stream of payments from [AsiaTrust] to California.' [Citation.] A continuing receipt by AsiaTrust of compensation from the California trustee of a California trust. AsiaTrust's acceptance from the California trust of money which AsiaTrust invested as directed by the California trustee and a California lawyer." (*Gilmore, supra*, 223 Cal.App.4th at p. 1573.)

a. *Velocity*

Plaintiff contends Velocity's contacts are similar to those in *Gilmore* in that Velocity: (1) communicated with Phan and Wallack by telephone, e-mail and mail about the opening of the WC Costa Rica account and its initial funding while they managed the account from Orange County, California; (2) "performed due diligence on Phan and [WC] Costa Rica"; (3) received "documentation [prepared and sent from California by

11

Phan and Wallack] relating to [WC] Costa Rica, its financial condition and creditworthiness, and Phan's and Wallack's business character and investment experience"; and (4) collected "compensation, in the form of fees, for the introductory services it provided to Phan, Wallack, and [WC] Costa Rica." The asserted similarities either do not exist or do not demonstrate purposeful availment on the part of Velocity.

Unlike in *Gilmore*, Velocity's communications with Phan and Wallack were for "a one-time transaction" limited to helping them set up a Forex account by introducing them and WC Costa Rica to AM. Plaintiff has made no showing that Velocity reached back to California or benefited from California in any manner, whether from its communications, due diligence, or receipt of documents or fees.

By contrast, the due diligence performed in *Gilmore* and receipt of documentation were just two of many factors the court considered in what was supposed to "an ongoing contractual relationship for Cindy's[2] lifetime" from which AsiaTrust received substantial compensation. (*Gilmore, supra*, 223 Cal.App.4th at p. 1572.) Here, Velocity's part in the matter ended once it introduced Phan and WC Costa Rica to AM and it received no fees from California. In his declaration in support of Velocity's motion to quash, Simon Law, a member and director of Velocity, attested that the only thing Velocity did for WC Costa Rica was to introduce it to AM. For that, Velocity "receive[d] commissions from [*AM*]," a non-California entity. Neither of the WC entities paid any money directly to Velocity. Additionally, Velocity generally "was not privy to any communications or information relating to banking relationships and/or transactions by any of the [WC] entities." Plaintiff presented no contrary evidence and has not established Velocity purposefully availed itself of California's benefits. The trial court correctly granted Velocity's motion to quash.

---

2    Cindy is the beneficiary of the trust for which the defendant, AsiaTrust, agreed to serve as the trustee. (*Gilmore, supra*, 223 Cal.App.4th at p. 1564.)

b. *AM*

Plaintiff argues AM's contacts with California are analogous to those in *Gilmore* because AM: "provided its trading platform and dealer services to Phan, Wallack, W[C] Costa Rica, and, eventually, [WC California;] . . . communicated with Phan by email, mail, and telephone to Orange County, California[;] . . . performed due diligence and required Phan and W[C] Costa Rica to complete forms it provided[;] . . . accepted wired funds from [WC California into] W[C] Costa Rica's [forex account;] . . . applied, through [its] trading platform, the investment directions on behalf of W[C] Costa Rica, all of which originated in California[; and] received compensation from Phan and W[C] Costa Rica for the services it provided." We are unpersuaded.

As with Velocity, AM's communications, performance of due diligence, acceptance of wire transfers from California, and application of Phan's investment instructions all related to AM's provision of services to its client, WC Costa Rica. But in *Gilmore*, AsiaTrust did more than service the account of its client. It solicited business from California by sending Sonia promotional materials, marketed to her the advantages of forming a trust in its jurisdiction, negotiated the contract that was signed in California by Sonia, a California resident, with another California resident, Berardo, who also witnessed the contract being signed in California. AsiaTrust then invoiced Sonia for thousands of dollars in fees. It also wire transferred funds *from* a Swiss annuity *to* the retirement fund to a bank account in California. (*Gilmore, supra*, 223 Cal.App.4th at pp. 1565-1567, 1572.)

These additional facts differentiate this case from *Gilmore*. According to Brocco's declaration in support of AM's motion to quash, AM "did not solicit or otherwise make the initial contact with WC Costa Rica" but was introduced to it by Velocity. Although AM knew of WC California's existence and that its principals were physically located in California, it had no contractual or other relationship with them or their affiliates. Its contract was solely "with WC Costa Rica to provide services as a

13

dealer with respect to it and its offshore [Forex] trading operations and not to conduct any business in . . . California." Plaintiff does not claim AM sent promotional materials to Phan or Wallack.

The instructions for AM's contract with WC Costa Rica directed Phan to send all necessary documents to an address in Florida. Under the instructions, Phan was advised that funds must be sent to the same Florida address and that amounts over $10,000 must be wired to a bank located North Carolina.

The record does not reflect where Phan signed the contract. But in signing it, she agreed the contract was to be "governed by, and construed in accordance with, the laws of the State of Florida," consented to Florida's jurisdiction in any matter arising out of the contract and acknowledged AM is "a company organized under the laws of the State of Florida."

Unlike in *Gilmore*, where AsiaTrust wire *transferred funds into* a California bank account (*Gilmore, supra*, 223 Cal.App.4th at pp. 1565-1567, 1572), plaintiff's claim here is that AM *accepted* the funds that were wired *from* WC California into WC Costa Rica's *offshore* Forex account, presumably located in Turkey based on plaintiff's counsel's declaration, not that AM *itself* transferred the funds. Plaintiff does not explain how merely *allowing* WC California to transfer the funds to an offshore account makes this case analogous to *Gilmore*.

Plaintiff maintains "AM reap[ed] obvious benefits as a result of servicing its client's account[], because it is compensated for doing so." But no evidence shows who compensated AM or from where. Plaintiff failed to provide any record citation to support his contention that AM was paid by Phan and WC Costa Rica. As such, we """"may treat it as waived."""" (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384 [claim of error forfeited by failure to provide appropriate citations to the record].)

14

Even if the argument was not waived, the record does not allow this court to determine where AM was compensated from. AM could have been compensated from Phan and Wallack in California, the *Swedish* bank identified on the corporate documents filled out by Phan for WC Costa Rica, the *Turkish* bank mentioned in plaintiff's counsel's declaration, or the "*non-U.S. banking institution*" referenced in the declaration of AM's counsel. Making it even more uncertain are two letters sent by Phan to AM written on two different WC Costa Rica business letterheads each with a different address: one in *Costa Rica* and the other in *Sweden*. Without verification by Phan or AM, or a postmarked envelope, it cannot be determined where the letters originated.

We also reject plaintiff's claim that AM purposefully derived economic benefits from California "in the form of commissions/fees, by conducting business with W[C California.]" In Brocco's declaration, he attested that AM "did not maintain any business relationship with WC California." Although AM knew of its existence and "that WC Costa Rica had principals who were physically located in . . . California," it "only contracted . . . with WC Costa Rica to provide services as a dealer with respect to it and its offshore trading operations and not to conduct any business in the State of California. [AM] did not seek to, and did not, maintain any relationship contractual or otherwise with WC California or any affiliates thereof besides WC Costa Rica."

And even if AM received a financial benefit from California in the form of compensation by Phan, "[a]ny promotion of [its] California financial interests was incidental. Everything [it did] was done in [its] capacity as a [Forex trading platform and dealer service provider], and [it] thus lacks the necessary close relationship to the State of California in these matters to justify the assertion of personal jurisdiction over [it]." (*Edmunds, supra*, 24 Cal.App.4th at p. 236.)

Unlike in *Gilmore*, plaintiff here has not provided sufficient competent evidence to show the """latticework" of contacts'" linking AM to California or that AM's "'forum activities should [have] put [it] on notice that [it] will be subject to litigation in

15

the forum.'"  (*Gilmore, supra*, 223 Cal.App.4th at p. 1573.)  No error occurred in the granting of AM's motion to quash service.


### 2.  *Remaining Requirements for Specific Jurisdiction*

Because plaintiff has not carried his burden of establishing Velocity and AM purposefully availed themselves of California's benefits, we need not address the remaining requirements for specific jurisdiction.

### III
### DISPOSITION

The orders are affirmed.  Respondents shall recover their costs on appeal.



MOORE, J.


WE CONCUR:



BEDSWORTH, ACTING P. J.



ARONSON, J.

16