Filed 3/12/15  Klotz v. Ezzes CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ADAM M. KLOTZ et al., | B254438 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC497629) |
| v. | |
| STEVEN EZZES, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Joseph R. Kalin, Judge.  Reversed.

Fox Rothschild and Michael Eidel for Plaintiffs and Appellants.

Kendall Brill & Klieger, Bert H. Deixler, Laura W. Brill and Joshua W. Sussman for Defendant and Respondent Steven Ezzes.

————————————

Plaintiffs Adam M. Klotz, Richard A. Spitz, and SageMill Capital Advisors LLC appeal the trial court's order quashing service of the summons and complaint on defendant Stephen Ezzes. Plaintiffs alleged claims against Ezzes for conspiracy and intentional interference with contract in connection with a failed business opportunity of SageMill. Ezzes, who is a resident of Connecticut and traveled to California four times during the plaintiffs' negotiations with third parties concerning the business opportunity ostensibly on unrelated matters, sent over 100 emails to his alleged co-conspirator in California. Plaintiffs contended this contact was sufficient to establish personal jurisdiction, but the trial court found insufficient physical presence to justify jurisdiction. We reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Klotz and Spitz met in May 1991 while both were associates at the law firm of Paul, Hastings. In the summer of 2009, one of Klotz's clients introduced Stephen Bruce to Klotz.

In December 2009, Klotz, Spitz, and Bruce formed a partnership to be known as "SageMill Capital Advisors LLC" (SageMill). In forming SageMill, the partners sought to capitalize on their trading, portfolio management, structured finance, and capital markets experience to benefit SageMill's clients. SageMill's primary focus was to be tailored, short-term investment strategies for investors holding large positions in cash or near-cash securities. SageMill would generate returns surpassing those of U.S. Treasuries without exceeding the risk of AAA/AA type corporate debt. The partners envisioned that SageMill would function as an investment advisor by drawing upon the partners' collective expertise and would employ rigorous methodologies to identify, select and monitor opportunities to deliver carefully and conservatively targeted returns, as well as to craft optimized blends of such opportunities based upon characteristics such as volatility and correlation.

Thereafter, the parties developed the business over a 20-month period before the filing of SageMill's certificate of formation on August 16, 2011. The parties entered into

an operating agreement on July 19, 2012; the operating agreement was effective retroactive to January 1, 2012.

In July 2012, SageMill was poised to complete a transaction with Abu Dhabi Investment Company (IAD) whereby the two entities would form a joint venture or other jointly owned entity that would be financed by IAD and provide services to IAD and other clients sourced by IAD and SageMill (the Venture). The business operating model (Operating Model) of the Venture envisioned profits after five years of $117 million, and predicted that the Venture would be worth a multiple of that amount. The partners shared the first three years of the Operating Model with IAD, who agreed with the partners' estimates that it represented a reasonable and conservative projection of what the Venture could achieve.

### 1. The Failed Negotiations with IAD

In late 2011, Andrew Felner of CitiBank introduced SageMill to IAD. Felner had a relationship with Stephen Swanson of IAD and believed SageMill was a good fit for IAD. On February 13, 2012, Bruce, Felner, Spitz, Swanson and Biswajit Dasgupta (also from IAD) spoke on the phone. Shortly thereafter, Bruce and Spitz flew to New York to meet with Swanson and Felner to discuss how to best proceed with negotiating a transaction. For the next several months, the parties continued their negotiations.

On April 24, 2012, IAD invited Bruce, Klotz, and Spitz to Abu Dhabi. The meetings were a success, with Swanson praising the parties' talents and experience and expressing a unique "confluence of broad business interests between potential partners as great as that which existed between IAD and SageMill." SageMill had a broad array of businesses, including its foundational "Structured Product Business," and a "Manager of Managers" business, in which SageMill would identify, select, and monitor top money managers, while entities like IAD would provide clients. However, unbeknownst to Klotz and Spitz, during this time, Swanson, Bruce and Ezzes were actively working to undermine the Venture. Bruce intended to negotiate his own separate transaction with IAD in which he would be partners with Swanson and Ezzes.

3

During the period July 20 to July 25, 2012, Swanson, Dasgupta, Bruce, Klotz, and Spitz met in Los Angeles to work out the terms of the Venture. Early on during the negotiations, Swanson told Klotz and Spitz that IAD was prepared to provide all of the Venture's working capital in exchange for 50% of the Venture. Spitz and Klotz believed that IAD was serious about closing a deal while in Los Angeles.

On the evening of July 23, 2012, the negotiations began to falter for no reason apparent to Klotz and Spitz at the time. In an abrupt about-face, Swanson said that, although he believed terms could be worked out, Dasgupta was uncomfortable with the terms, and in particular the compensation levels. Swanson said that SageMill might be undervaluing IAD's contributions to the venture and that IAD could establish a structured product business on its own "by hiring someone like Bruce." Despite the setback, Swanson said he did not believe the parties really were too far apart and suggested they call it a day and resume the following morning. Plaintiffs allege that Bruce, however, was already having surreptitious communications with Swanson and Dasgupta, and was working throughout the IAD visit to steal SageMill's opportunity (and indeed SageMill itself) for his own benefit.

On Tuesday, July 24 Klotz and Spitz met with Swanson in the morning to continue their discussions. Swanson began the session by acknowledging that the prior day was not productive, and again offered the same terms, but without guaranteed bonuses. He also indicated that IAD would be willing to make a two-year commitment and that if it decided to walk away after the second year, SageMill could have the Venture for itself and would not owe IAD anything, including any return of working capital.

Feeling generally encouraged, Klotz and Spitz told Swanson that they had to discuss the deal with their partner, Bruce. Klotz and Spitz accepted Swanson's terms and remembering the prior day's experience, emphatically indicated that neither a time commitment or salaries was a deal point. The parties agreed to meet later that evening, with Bruce noting to Klotz and Spitz that it was "time to close." Meanwhile, Bruce was

4

busy meeting with Swanson and Dasgupta without Klotz and Spitz's knowledge. Bruce had already discussed with Swanson and Dasgupta the terms Swanson would he proposing to Bruce's own partners.

At the evening meeting, Swanson began what turned out to be his final negotiation session with Klotz and Spitz by once again retracting the offer made earlier in the day and stated that IAD wanted only Bruce and Dasgupta to participate directly at the Venture level and that Klotz and Spitz should remain in SageMill and would receive roughly half the compensation of Bruce. Klotz cautioned Swanson that such an arrangement would run afoul of the parties' operating agreement and the spirit of the parties' long-standing partnership.

Negotiations were scheduled to continue on the morning of July 25, but Swanson and Dasgupta never arrived. Bruce, throughout that morning, corresponded with Swanson and Dasgupta to secure his own deal with IAD. At no time did Bruce disclose to plaintiffs that he had been communicating and secretly meeting with Swanson and Dasgupta throughout the IAD's visit.

On Monday July 30, 2012, IAD sent an email to the partners indicating that IAD was unwilling to consummate a transaction with SageMill due to SageMill's "partnership dynamics." After hearing about the email, Bruce expressed his frustration to Klotz, telling him that he "can't believe he [Bruce] signed that Operating Agreement." Bruce questioned Klotz's/Spitz's integrity and blamed them for the failed negotiations.

2. *Ezzes's Involvement*

In the months leading up to IAD's visit to Los Angeles, Bruce communicated with Ezzes and disclosed the existence and specifics of SageMill's business, particularly its negotiations with IAD, without consulting or informing his partners Klotz and Spitz. Bruce, Ezzes and Swanson met on June 21, 2012 in New York, without plaintiffs' knowledge, to discuss the SageMill business. Bruce told Swanson, he had been discussing SageMill with Ezzes "from day one." Ezzes had already begun email conversations with Bruce to join the SageMill–IAD venture.

5

Ezzes, who has an extensive track record in the finance industry, was a manager of Mariner Investment Group, and a close confidant of Bruce. Yet, at no time was Ezzes a part of the SageMill team, and Bruce did not inform Klotz. and Spitz that he was sharing confidential SageMill information with Ezzes. Bruce never mentioned or introduced Ezzes to Klotz and Spitz.

Bruce had been giving Ezzes proprietary SageMill information from the earliest stages of the partnership. On October 3, 2011, Bruce sent Ezzes by email Sage Mill's "Proprietary Advisory Introduction," a PowerPoint presentation detailing SageMill's investment strategy and the benefits of utilizing SageMill's services. Ezzes also had access to the "'highly confidential' Three-Year Operating Model and Budget that Klotz had sent to IAD in June 2012, which Bruce sent Ezzes" by email. The document contained extremely sensitive financial projections and fee information related to the SageMill-IAD partnership. On July 13, 2012, Ezzes emailed Bruce and referred to the fact they would be working together.

During the SageMill–IAD negotiations in July 2012, Bruce and Ezzes communicated daily by email. After the SageMill-IAD opportunity fell apart at the end of July 2012, Bruce immediately began communicating with Ezzes and went to work with Ezzes to resurrect the IAD deal (in a form that excluded Klotz and Spitz as partners), and lay the groundwork for ultimately going into business with Swanson. On August 1, 2012, Bruce inquired of Ezzes about software packages to be used for a "'fund of funds'" business, noting that he was putting together a budget and had "'plenty of working capital.'" Ezzes indicated he wanted to introduce Bruce to Nino Carpenito, a hedge fund manager from New Mexico. Ezzes told Bruce it was time to begin formally planning their new business. In August 2012, Ezzes emailed Swanson about Ezzes's trip to California, where he had met with Bruce, and stated, "[Bruce] is nearing the end of dealing with his former partners. Seems like an odd odyssey since [Bruce] is the only one with experience to conduct the contemplated businesses. I can tell you [Bruce] is very excited to get all of this behind him and move forward with the opportunity. We

6

spent much of the day talking about how best to capitalize on what is a unique environment."

Ezzes, Swanson and Bruce worked together on a project in which Bruce was the architect of a new proposed joint venture with IAD to focus on the same type of investments that SageMill had contemplated doing with IAD or other investors. Ezzes, Swanson and Bruce embarked on a new investment project called Treowe, a "Debt Fund Management'' business that was intended to engage in the same business that SageMill contemplated. Bruce, Ezzes and Swanson prepared and distributed marketing materials for Treowe.

Treowe's marketing materials make clear that it is an asset management business pursuing the same business opportunities that SageMill was to pursue. The Treowe Management team includes Bruce as the CEO (Chief Executive Officer) and CIO (Chief Investment Officer), Ezzes as the COO (Chief Operating Officer) and Swanson as a strategic and business advisor. For Treowe, Bruce used the proprietary financial model built for the SageMill business (i.e., the Operating Model and Budget).

Plaintiffs' First Amended Complaint stated claims for against Bruce and Swanson for declaratory judgment, breach of fiduciary duty, breach of contract, unfair competition, breach of implied covenant of good faith and fair dealing, conspiracy (against Bruce, Ezzes and Swanson), intentional interference with contract (against Bruce, Ezzes and Swanson), and sought damages in excess of $50 million, injunctive relief, and punitive damages.

### 3.  *Motion to Quash*

Ezzes, a Connecticut resident, moved to quash service of the summons and complaint on him for lack of personal jurisdiction. Currently, Ezzes works at Mariner Investment Group, an asset management firm based in Harrison, New York. Ezzes had not lived in California for over 30 years. During the 1960's through the early 1980's, Ezzes lived in Los Angeles, attended college and business school at UCLA in the 1970's, and lived in San Francisco in 1980 and 1981 to work at Morgan Stanley. Ezzes did not

7

own property in California, had not been an officer of a California corporation, had not been professionally licensed in California, does not hold or own bank accounts or stock in California, and does not hold a current California driver's license. He does not, and has never, conducted any personal business in California. He is only in California on rare occasions to do work for Mariner for no more than two to three days a year, if at all.

Ezzes met Bruce in the mid-1990's when both worked at Lehman Brothers in New York. Subsequently, Bruce moved to California to start a business managing collateralized loan obligations, and currently, Bruce lives in Calabasas, California. In June 2012, Bruce invited Ezzes to lunch in New York to discuss a new business venture Bruce had set up with individuals based in California; subsequently, the two men had lunch with Swanson. Bruce introduced Swanson as the general counsel of IAD, and explained that Bruce and two other individuals had approached IAD about investing in Bruce's new venture. Bruce requested Ezzes to introduce Bruce to certain of Ezzes's contacts at JP Morgan and Bank of America to explore whether such institutions would be interested in underwriting the securities that Bruce and the other two individuals in the Venture intended to issue through the Venture.

Later, Ezzes attended a meeting where he introduced Bruce and Swanson to Ezzes's contacts at JP Morgan and Bank of America. Ezzes did not expect to be involved in the Venture, and did not discuss the Venture with Bruce or Swanson, nor did he learn any details of Bruce's relationship with the other two individuals involved in the venture because Bruce described the Venture in very broad terms. Ezzes did not have a financial interest in the Venture, nor was he invited to serve in the role of investor, partner, member, officer or employee. All of Ezzes's communications with Bruce were for the sole purpose of introducing Bruce to Ezzes's connections at JP Morgan and Bank of America.

In July 2012, Bruce told Ezzes that the two individuals involved with IAD had an unsuccessful meeting with IAD, and that IAD had reservations about the two individuals and thus IAD wanted to invest with Bruce only. Later, Bruce told Ezzes that IAD did not

8

want to be involved with Bruce at all. IAD had determined that the Venture was outside the scope of IAD's business. Ezzes was not privy to any of these conversations and only learned of the status of the Venture and IAD through Bruce.

Ezzes argued this evidence established he did not have sufficient contacts with California to confer jurisdiction. First, general jurisdiction did not exist because his limited contact with Bruce did not establish continuous and systematic contact with California because Ezzes was only in California two to three days a year on business for his employer Mariner. Second, Ezzes had not engaged in any conduct aimed at or targeted at California because the only time Ezzes met with Bruce was in New York; Ezzes did not have any involvement in the Venture; Ezzes did not know of the details of Bruce's relationship with the plaintiffs and thus could not know of any alleged harm to be caused to plaintiffs in California; and Ezzes's conduct did not arise out of California related activities as Ezzes had no involvement in the Venture in California.

Plaintiffs' opposition asserted that Ezzes had traveled to California in August 2012, October 2012, April 2013, and the summer of 2013; during August 2012, met with Bruce and came to SageMill's offices in Calabasas; met with a business associate in California in October 2012 about Ezzes's involvement in the Venture with IAD and Bruce; and was in California in April 2013 in connection with a presentation by Bruce and Swanson and Ezzes's Treowe Partners to Orchard Capital. Further, plaintiffs asserted that Ezzes had traveled to California every year for business purposes since 2002.

Plaintiffs relied on Ezzes's four trips to California with respect to the SageMill business: (1) Ezzes's meeting with Bruce in Calabasas in August 2012; (2) Ezzes traveled to California in October 2012 to meet with a business associate (Carpenito) he wanted introduce to Bruce in connection with the joint venture business that Bruce was continuing to negotiate with IAD; this trip included Ezzes's meeting with an asset manager in Westwood, California called "ICG Advisors" (with whom the SageMill partners had previously discussed a strategic business arrangement with SageMill);

9

(3) Ezzes traveled to California in April 2013 to meet with Bruce, and although the meeting was canceled on short notice, Ezzes spoke with Bruce while in California; and (4) Ezzes traveled again to California in the summer or fall of 2013 to speak at a conference.

In addition, Ezzes sent 118 emails to Bruce from New York during the period 2011 through 2013, most of which involved the SageMill partnership. Treowe Partners, of which Ezzes is the Chief Operating Officer (COO), has its business office in Los Angeles, California, and Ezzes is a member of the management committee of Treowe Partners as the COO.

Plaintiffs argued specific jurisdiction existed because Ezzes purposefully availed himself of California by reaching beyond his home state to meet with Bruce, visit SageMill's offices, and develop a business relationship with Bruce; Ezzes's contacts with the forum were substantially connected with the harm to plaintiffs; and jurisdiction would be reasonable because Ezzes travels to California periodically, has no financial hardships, and could be deposed in New York.

In reply, Ezzes contended that he had never traveled to California to conduct any personal business with Bruce or anyone else, and his meeting with Bruce in August 2012 occurred only because he happened to be in California, and meeting with Bruce was not the purpose of his visit. Second, Ezzes never discussed joining the IAD venture, but would consider joining any venture that Bruce might set up in new York. Third, his presence in California in October 2012 (at a football game in San Diego with Carpenito) was related to his business with Mariner, and Ezzes had suggested Carpenito might meet Bruce in order to assist Bruce. Fourth, on the same visit, Bruce did not meet with ICG, a money manager based in Westwood, except on business for Mariner. Fifth, he did not meet with Bruce in California in April 2013. Sixth, Ezzes has only visited California once or twice a year since 2008. Seventh, Treowe is not a business but a concept Ezzes created for discussion to raise capital for a venture that has not materialized, and thus

10

Ezzes was not the COO of such an entity. Finally, not all of the 118 emails were sent to Bruce while Bruce was in California.

### 4. Trial Court Ruling

At the hearing, the trial court stated plaintiffs had not demonstrated minimum contacts. "There were emails to one's best friend in California. There were four visits to California over two years. This does not approximate physical presence as to justify the exercise of general jurisdiction." The court observed that Ezzes had not done business in California. After taking the matter under submission, the court granted the motion to quash.

### DISCUSSION

Plaintiffs argue that general jurisdiction over Ezzes exists based on Ezzes's nearly annual business trips to California every year since 2002, and there is specific jurisdiction over Ezzes because Ezzes traveled to California for the purpose of meeting with Bruce about the Venture, which is the subject of the claims in this case, sent more than 100 emails from New York to Bruce in California, and agreed to become the COO of a business that was to be located in California. Ezzes contends that plaintiffs waived their substantial evidence challenges on appeal because their opening brief only refers to evidence in their favor. On the merits, Ezzes contends that no general jurisdiction exists because he had no continuous and systematic contact with California, and no specific jurisdiction exists because he did not engage in any tortious conduct expressly directed at California, and did not cause any effects foreseeable in California.

## I. Standard of Review

On a defendant's motion to quash for lack of personal jurisdiction, the plaintiff bears the initial burden of establishing a factual basis for jurisdiction by a preponderance of the evidence. If the plaintiff satisfies this burden, the burden shifts to the defendant to show that the exercise of jurisdiction would be unreasonable. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*).) "On review, the question of jurisdiction is, in essence, one of law." (*Dorel Industries, Inc. v. Superior Court* (2005)

11

134 Cal.App.4th 1267, 1273.)  If there is a conflict in the evidence, we review the trial court's factual determinations for substantial evidence; but even where there is a conflict, "we review independently the trial court's conclusions as to the legal significance of the facts."  If there is no conflict in the evidence, our review of the jurisdictional question is de novo.  (*Ibid.*)

## II.     Exercise of Jurisdiction

California's long-arm statute permits the exercise of jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States."  (Code Civ. Proc., § 410.10.)  Constitutionally, California courts may exercise personal jurisdiction over nonresidents who have "minimum contacts" with the state.  Minimum contacts exist where the relationship between the resident and the forum state is such that the exercise of jurisdiction does not offend "'traditional notions of fair play and substantial justice'" under the due process clause.  (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [66 S.Ct. 154, 90 L.Ed. 95].)  "The due process clause is concerned with protecting nonresident defendants from being brought unfairly into [the forum state], on the basis of random contacts."  (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 452 (*Vons Companies*).)

### A.     *General Jurisdiction*

Personal jurisdiction is either general or specific.  If the defendant's forum-related contacts are extensive and wide-ranging, or substantial, continuous and systematic, the defendant may be subject to the court's general jurisdiction.  (*Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, 717.)  In the case of general jurisdiction, the claims at issue need not be connected with the defendant's business relationship to the forum.  Instead, the defendant is subject to the California court's jurisdiction for all causes of action raised against it.  (*Vons Companies*, *supra*, 14 Cal.4th at p. 445.)  "Such a defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction.  [Citation.]"  (*Id.* at p. 446.)

12

General jurisdiction is proper only where the defendant's contacts in the forum are continuous and systematic. Continuous and systematic contacts include such activities as maintaining an office and employees in the forum, use of forum bank accounts, and the marketing or selling of products in the forum state. (*Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 415 [104 S.Ct. 1868, 80 L.Ed.2d 404]; *Shisler v. Sanfer Sports Cars, Inc.* (2006) 146 Cal.App.4th 1254, 1258–1259.)

In *Cassiar Mining Corp. v. Superior Court* (1998) 66 Cal.App.4th 550, the defendant was incorporated in Canada, mined and milled raw asbestos in British Columbia, and sold raw asbestos fibers to manufacturers, including several different companies with California plants. For 38 years, the defendant sold thousands of tons of raw asbestos to California operations. Despite the fact the defendant had sold thousands of tons of its product to several California companies over a period of 38 years, there was no general jurisdiction because the defendant's contacts with California were limited to sales to California operations and did not include offices, employees, bank accounts, or real property within the state, or advertisement in any California trade journals or publications. (*Id.* at p. 555.)

Here, Ezzes's contacts with California do not approximate physical presence within the state, nor do his recent dealings with SageMill and Treowe Partners approximate presence in the state. They have been limited to once a year visits to clients, and more recently, a string of emails regarding the failed Venture with IAD and four visits over a two-year period regarding IAD and Treowe. Ezzes did not maintain a residence, bank account, or have a California driver's license. Such contacts are not sufficiently systematic and continuous to warrant general jurisdiction.

### B. Specific Jurisdiction

Specific personal jurisdiction, on the other hand, may exist if the defendant's forum-related activities are not so pervasive as to justify an exercise of general jurisdiction. Specific jurisdiction results when the defendant's contacts with the forum state are sufficient to subject the defendant to suit in the forum on a cause of action related to or

13

arising out of those contacts. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 536.) Whether jurisdiction exists turns on the quality and nature of the defendant's activities in the forum related to a particular cause of action. (*Cornelison v. Chaney* (1976) 16 Cal.3d 143, 147–148 (*Cornelison*).) We therefore consider the relationship between the defendant, the forum, and the litigation. (*Snowney*, *supra*, 35 Cal.4th at p. 1062.)

We will find specific jurisdiction where (1) the defendant has purposefully availed himself or herself of doing business in the state; (2) the controversy at issue arises from or is related to the defendant's forum-related contact; and (3) assertion of jurisdiction would be reasonable. (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*); *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 477–478 [105 S.Ct. 2174, 85 L.Ed.2d 528] (*Burger King Corp*).)

### 1. PURPOSEFUL AVAILMENT

"'Purposeful availment'" occurs where a nonresident defendant purposefully directs its activities at the residents of the forum, purposefully derives benefit from its activities in the forum, creates a substantial connection with the forum, deliberately engages in substantial activities in the forum, or creates continuing obligations between itself and residents of the forum. (See *Burger King Corp.*, *supra*, 471 U.S. at pp. 471–478.) By limiting the scope of a forum's jurisdiction in this manner, "[t]he 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." (*Id.* at p. 475.) The purposeful availment requirement focuses on the defendant's intentions. "'This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.]" (*Pavlovich*, *supra*, 29 Cal.4th at p. 269.)

Under the "effects test" analysis applied to the purposeful availment prong, as set forth in *Calder v. Jones* (1984) 465 U.S. 783 [104 S.Ct. 1482, 79 L.Ed.2d 804] (*Calder*),

14

the defendant must allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. (*Jewish Defense Organization, Inc. v. Superior Court* (1999) 72 Cal.App.4th 1045, 1057.) Merely asserting that a defendant knew or should have known that his intentional acts would cause harm in the forum state is not enough to establish jurisdiction under the effects test. The plaintiff must also point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum. (*Pavlovich*, *supra*, 29 Cal.4th at p. 269.) The effects test need not be applied under the purposeful availment prong in every tort case because the "effects test was not meant to restrict a court's jurisdictional reach, but rather to serve as an additional tool for a forum to exercise constitutional jurisdiction." (*Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1571 (*Gilmore Bank*).)

Here, defendant relies upon *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, to establish that internet conduct alone will not support jurisdiction. *Burdick* held jurisdiction was improper over an Illinois defendant who made allegedly defamatory statements about the plaintiffs, California residents, on the defendant's Facebook page. (*Id.* at p. 25.) *Burdick* applied the "effects test" of *Calder*, *supra*, 465 U.S. 783 and the recent Supreme Court decision of *Walden v. Fiore* (2014) 571 U.S. ___ [134 S.Ct. 1115, 188 L.Ed.2d 12]. *Walden* held that the suit must arise out of the defendant's contacts with the state that the defendant created, and must connect the defendant's conduct to the forum state, not just to a plaintiff who resides in California. (*Walden*, at pp. 1122–1123.) Both *Calder* and *Walden* "emphasize the difference between conduct directed at the plaintiff and conduct directed at the forum state itself." (*Burdick*, at p. 25.) Applying this test, *Burdick* concluded that there was no evidence the defendant's Facebook page focused on California, the posting was directed at California residents, or that the persons or institutions to whom the posting was directed (defendant's Facebook friends) resided in California. (*Id.* at p. 25.)

15

Postings on a Facebook page, which has an amorphous and semi-public audience, differ from the emails at issue here, which were exchanged between two individuals in private. In *Gilmore Bank*, *supra*, 223 Cal.App.4th 1558, a judgment creditor sought to recover fraudulently transferred funds from the defendant New Zealand bank, where the judgment debtor had set up a trust. The bank received compensation for shielding the judgment debtor's assets from the judgment creditor. The bank sought to quash service of the summons on the basis that it did not do business in California and none of its representatives traveled to California, although the bank received wire transfers from another defendant's bank account in California and the parties communicated by email. (*Id.* at pp. 1564–1565.)

*Gilmore Bank*, *supra*, 223 Cal.App.4th 1558 found specific jurisdiction based upon the bank's purposeful availment of the California forum, noting that "'in this age of telecommunications, fax machines, and rapid mail services it is possible to [solicit and negotiate investments] without face-to-face meetings in any jurisdiction.' [Citation.] It 'is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.' [Citation.] 'While any single telephone call or piece of correspondence might not be enough to satisfy the "minimum contacts" requirement, there is much more in this case. Here there was a veritable "latticework" of contacts linking [AsiaTrust] and the State of California: not one but many calls and other communications to California during the negotiations. The execution in California of the legal documents which formed the arrangement . . . . A continuing stream of payments from [AsiaTrust] to California.'" (*Id.* at pp. 1572–1573.)

Similarly, in *Hall v. LaRonde* (1997) 56 Cal.App.4th 1342, the plaintiff, a California resident, initially contacted the defendant, a New York resident, by email concerning a software module the plaintiff had written. The parties incorporated the module into defendant's retail product, and the defendant agreed to compensate the plaintiff for each license of the program sold. The plaintiff developed the software in

16

California; all negotiations over the software were conducted by email and telephone; and the plaintiff had no other connections to New York. (*Id.* at pp. 1344–1345.) Further, the defendant reached out to California and worked with the plaintiff in integrating the module into defendant's software, the parties continued to work on the product, making modifications to it, and the parties contemplated continuing royalty payments to the plaintiff. (*Id.* at p. 1347.) In assessing whether special jurisdiction existed, the court observed that "[t]here is no reason why the requisite minimum contacts cannot be electronic." The court found the defendant's contacts with California were more than random, fortuitous and attenuated and that specific jurisdiction existed because it was fair for the defendant to account in California for the consequences of his activities that arose in California. (*Ibid*.)

Thus, we conclude that Ezzes purposefully availed himself of California. Ezzes's visits to California admittedly had a dual purpose (on the one hand, Ezzes's business for Mariner and on the other, his meetings with Bruce). There is also the establishment of a new business enterprise in California (Treowe) of which Ezzes held a significant management role. Finally, there was a constant stream of emails back and forth. These emails were crucial to the defendants' alleged enterprise of undermining the SageMill negotiations with IAD and the creation of their own business endeavor that employed SageMill's proprietary information.

Further, Ezzes's conduct satisfies the effects test of *Calder*, *supra*, 465 U.S. 783. Ezzes committed an intentional act (assisting Bruce in causing the demise of the Venture), that was expressly aimed at California because the parties and the partnership resided here, that caused harm Ezzes knew was likely to be suffered in the forum state—namely, SageMill's loss of the joint venture.

### 2. CONTROVERSY ARISING FROM FORUM CONTACT

A controversy is related to or arises out of a defendant's forum contacts where there is a substantial connection between the forum contacts and the plaintiffs' claim. (*Vons Companies*, *supra*, 14 Cal.4th at p. 453.) However, "A claim need not arise directly from

the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction. Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate." (*Id.* at p. 452.) "[W]e consider not only the conduct directly affecting the plaintiff, but also the broader course of conduct of which it is a part." (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 979.)

Here, the plaintiffs' claims arise out of Ezzes's contacts with California: Ezzes's alleged efforts to assist Bruce in usurping the SageMill Venture with IAD for their benefit occurred primarily in California through emails and face-to-face meetings in California with Bruce. The net result of Ezzes's contacts with California was Bruce's and Ezzes's alleged wrongful act of causing the Venture negotiations to fail so that Bruce, Ezzes, and others could step in and form a joint venture with IAD, as well as form Treowe Partners, a business that offered financial services in a manner that was substantially similar to that contemplated by SageMill.

### 3. REASONABLENESS OF JURISDICTION

Factors related to the determination of whether an exercise of specific jurisdiction is reasonable include the burden on the defendant to defend himself in California, the interest of the forum state, and the plaintiff's interest in obtaining relief. (*Cornelison*, *supra*, 16 Cal.3d at p. 150–151.) "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. [Citations.] On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." (*Burger King Corp.*, *supra*, 471 U.S. at p. 477.) The intensity of the defendant's contacts with the state and the reasonableness of the exercise of jurisdiction are inversely related: the stronger the contacts, the more reasonable an exercise of jurisdiction becomes; the stronger the showing of reasonableness, the smaller the degree of contacts that need be shown to establish purposeful availment. (*Id.* at pp. 477–478.)

18

Here, jurisdiction is reasonable.  Ezzes admittedly already travels to California on business several times a year.  Although he lives and conducts his business on the East Coast, he has business interests in California (Treowe).  Requiring him to come to California to participate in this litigation thus does not place any undue burden on him.

Lastly, we point out that we find no waiver here based upon plaintiffs' supposedly selective recitation of the facts.  The facts advanced by the plaintiffs, as well as the other facts in the record, support specific jurisdiction.

## DISPOSITION

The order is reversed.  Appellants are to recover their costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.