Filed 7/24/24  Geng v. Shandong Oriental Ocean Group Co. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| XUAN GENG, | |
| Plaintiff and Appellant, | G062367 |
| v. | (Super. Ct. No. 30-2020-01161695) |
| SHANDONG ORIENTAL OCEAN GROUP CO. LTD., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Derek W. Hunt, Judge.  Reversed and remanded with instructions.

Law Offices of Danning Jiang and Danning Jiang for Plaintiff and Appellant.

Law Offices of Andrew Ritholtz and Andrew Ritholtz; Wewin Law Firm and Qingguo Meng for Defendant and Respondent.

## INTRODUCTION

Respondent Shandong Oriental Ocean Group Company, Ltd. (SOOG), a Chinese company, borrowed a sizeable sum of money from appellant Xuan Geng, a resident of Irvine, in 2017. The parties executed a short and somewhat cryptic agreement under which SOOG would have to repay interest on the principal on a yearly basis. After making one payment in 2018, SOOG failed to make any more payments, and appellant filed suit in Orange County Superior Court. SOOG filed a motion to quash summons, arguing, among other things, that it did not have any connection with California and lacked minimum contacts for personal jurisdiction. The trial court agreed and entered SOOG's dismissal. We reverse.

## FACTS

Shi Che and Zhiyuan Che are father and son, respectively, and Chinese citizens. They own and control SOOG, a Chinese corporation with its principal place of business in Yantai City, China.[1]

Appellant lives in Irvine. Appellant's husband, David Hsiu, and Shi Che have been friends for many years, and the two families are close. As a matter of fact, Shi Che had given appellant's daughter, Nancy Hsiu, power of attorney in 2014 to manage an investment property he purchased in Irvine at 65 Cortland (the Cortland property). The Cortland property was near appellant's home.

Around the time he purchased the property, Shi Che opened a bank account in Irvine in his own name, with the Cortland property as his mailing address. Hsiu was given signing power on this account to make payments necessary to carry and maintain the property. Hsiu says Shi Che and Zhiyuan Che have used the Irvine bank account to pay property taxes, homeowners' association fees, and repair and maintenance charges related to the Cortland property.

---

[1] It is unclear what business SOOG conducts, aside from holding a minority stake in another Chinese business owned by Shi Che called Shandong Oriental Ocean Sci-Tech Co., Ltd. (Sci-Tech).

2

In 2015, Shi Che gifted the property to his son, Zhiyuan Che. Between December 2015 and January 2020, Zhiyuan Che wired over $300,000 into the Irvine bank account. Hsiu has used at least some of these funds over the years to pay Cortland property-related expenses.

*2017 Loan from Appellant to SOOG*

In 2017, Shi Che and Zhiyuan Che asked appellant's husband if appellant would loan them RMB 20,000,000[2], which in United States currency is roughly equivalent to $2.9 million. Shi Che told appellant the funds would be for personal use by him and his family, as well as for their business needs. On or about July 6, 2017, appellant signed a loan agreement with SOOG, by which SOOG borrowed RMB 20,000,000 from appellant at 10 percent annual interest. SOOG promised in return to pay the full amount of interest due on a yearly basis into an account designated by appellant.[3] Shi Che signed and stamped the agreement on SOOG's behalf.[4]

Appellant claims Shi Che told her to split the loan into two parts: one disbursement of $2.6 million and a second disbursement of $300,000. On these instructions, she wired $2.6 million from her California bank account to Zhiyuan Che's bank account in Hong Kong, which he transferred to his Chinese bank account. She then wired the other $300,000 from her son's California bank account to the North Carolina bank account of one Chamroen Chetty, a business associate of Zhiyuan Che.[5] The manner of this second disbursement was per Zhiyuan Che's wishes. Zhiyuan Che agrees he received parts of the loan proceeds "on behalf of Defendant Shandong Oriental" in his bank account in China. According to Nancy Hsiu, who has access to Shi Che's Irvine bank account, she has discerned that Zhiyuan Che's wire transfers for the

---

[2] "RMB, the currency in China, stands for 'Renminbi' (literally, 'the people's currency')." (*Xun Li v. Holder* (9th Cir. 2009) 559 F.3d 1096, 1101, fn. 5.)

[3] We agree with the trial court that this agreement seemed to most resemble a promissory note. However, it does not appear to require or give terms for repayment of anything but interest.

[4] The agreement was originally in Chinese, so a certified translation was provided to the court.

[5] Chetty is the CEO of Avioq Inc. (Avioq), a North Carolina-based company owned by Sci-Tech.

Cortland property were from the same Chinese bank account which held the bulk of the loan proceeds disbursed by her mother, appellant.

SOOG made one payment on the loan. Zhiyuan Che made three interest payments on the loan in July 2018. On July 11, 2018, he made two wire transfers from his Chinese bank account into appellant's California bank account; one for $149,974 and the second for $101,174. On the same day, he transferred another $49,974 from his Chinese bank account to Hsiu's California bank account. After these initial payments, the Ches and SOOG failed to repay any more of the debt.

*Lawsuit and Motion to Quash Service of Summons*

Appellant filed suit against SOOG[6] and the Ches on September 23, 2020, in Orange County Superior Court, alleging breach of contract and common counts. She further alleged the Ches and SOOG were alter egos of one another. The initial pleading was apparently served only on the general counsel for Avioq, Inc. in North Carolina, purportedly as a representative of SOOG.[7]

Appellant amended the complaint on July 29, 2022, adding Avioq and Chetty as defendants. Avioq and Chetty removed the case to federal court in September 2022, and a few weeks later, SOOG filed a motion to quash and dismiss the case against it for lack of personal jurisdiction, improper service, forum non conveniens and the written loan agreement's forum selection language. Appellant filed a second amended complaint shortly after, clarifying some additional details about the parties and transactions between them. The federal district court remanded the action back to Orange County Superior Court, finding Avioq and Chetty had not met the requirements for removal jurisdiction.

---

[6] Appellant erroneously named SOOG as "Shangdong Marine Group Ltd." in the original complaint.

[7] Of course, SOOG thought this was improper service, and we would agree. It would not be until September 2022 that appellant would finally serve SOOG under the Hague Convention.

4

After remand, SOOG refiled its motion to quash in the trial court on December 30, 2022.[8] SOOG asserted the same grounds it asserted in the federal court. In support of the motion, SOOG attached the declaration of Shi Che, who averred he was president of SOOG. He confirmed SOOG was a Chinese company, and has never had offices in California. He recounted how he had "repeatedly called" David Hsiu in July 2017 to negotiate the terms of the loan on SOOG's behalf. After the two had reached agreement, Shi Che said Mr. Hsiu arrived in Yantai City, China, bearing a copy of the loan agreement signed by appellant. Shi Che thereafter signed and stamped the document on SOOG's behalf. Shi Che's declaration also stated: "Zhiyuan Che and Chamroen Chetty are just agents designated for receiving money from Plaintiff," and SOOG "had received RMB 20,000,000 wired by Plaintiff."

Appellant opposed SOOG's motion to quash, arguing the court had specific personal jurisdiction over it due to the forum selection language in the contract, which constituted consent to jurisdiction in California courts. She also argued SOOG had minimum contacts with California sufficient to create jurisdiction and opposed the other grounds raised in SOOG's motion. Appellant attached her own declaration as well as one from her daughter, Nancy Hsiu, as well as records documenting wire transfers made from the Ches.

The trial court granted SOOG's motion based on lack of personal jurisdiction and dismissed it from the case without prejudice on December 30, 2022.

## DISCUSSION

"A California court may exercise personal jurisdiction over a nonresident defendant to the extent allowed under the state and federal Constitutions. (Code Civ. Proc., § 410.10.) The exercise of personal jurisdiction is constitutionally permissible

---

[8]    Almost concurrently with SOOG's motion, Shi Che and Zhiyuan Che filed their own individual motions to quash. Since this appeal pertains only to SOOG's motion to quash, we do not address the merits of their motions.

only if the defendant has sufficient 'minimum contacts' with the state so that the exercise of jurisdiction 'does not offend "traditional notions of fair play and substantial justice." [Citations.]' (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 . . .; accord, *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 (*Pavlovich*).) In other words, the defendant's contacts with the forum state must be such that the defendant had '"fair warning"' that its activities might subject it to personal jurisdiction in the state. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472 (*Burger King* ); accord, *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297.) [¶] 'In judging minimum contacts, a court properly focuses on "the relationship among the defendant, the forum, and the litigation." [Citations.]' (*Calder v. Jones* (1984) 465 U.S. 783, 788.) 'Each defendant's contacts with the forum State must be assessed individually.' (*Id.* at p. 790.) '"Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field. "' (*Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 115 . . . .)" (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 977-978 (*Anglo Irish Bank*).)

"When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of proof by a preponderance of the evidence to demonstrate the defendant has sufficient minimum contacts with the forum state to justify jurisdiction. (*Vons* [*Companies, Inc. v. Seabest Foods, Inc.* (1996)] 14 Cal.4th [, 434,] 449 [(*Vons*)]; *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1090.) The plaintiff must '"present facts demonstrating that the conduct of defendants related to the pleaded causes is such as to constitute constitutionally cognizable 'minimum contacts.' [Citation.]"' (*DVI, Inc. v. Superior Court*, *supra*, 104 Cal.App.4th at pp. 1090-1091.) An unverified complaint has no evidentiary value in meeting the plaintiff's burden of proving minimum contacts. (*Id.* at p. 1091.) [¶] When the evidence of jurisdictional facts is not in dispute, whether the defendant is subject to personal jurisdiction is a legal question subject to de novo review. (*Vons*, *supra*, 14 Cal.4th at p. 449.) When *evidence* of jurisdiction is in

dispute, the trial court's determination of factual issues is reviewed for substantial evidence. (*Ibid.*; see also *DVI, Inc. v. Superior Court*, *supra*, 104 Cal.App.4th at p. 1091.) We must accept the trial court's resolution of factual issues and draw all reasonable inferences in support of the trial court's order. (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 584.)" (*Thomson v. Anderson* (2003) 113 Cal.App.4th 258, 266-267, italics added.)

Here, the facts are not disputed. Rather, the parties dispute how those facts are to be interpreted legally for purposes of jurisdiction. Thus, our review is de novo.

## I.         Personal Jurisdiction Over SOOG

"The defendant's minimum contacts with the state must reasonably justify haling it into a California court to conduct a defense. (*Pavlovich* [*,supra,*] 29 Cal.4th [at p.] 268.) . . . [¶] Personal jurisdiction may be general or specific. If the defendant's contacts are substantial, continuous, and systematic, the defendant may be subject to California's *general* jurisdiction. (*Vons*, *supra*, 14 Cal.4th at p. 445.) [¶] If general jurisdiction is not established, a nonresident defendant may still be subject to California's *specific* jurisdiction if a three-prong test is met. (*Vons*, *supra*, 14 Cal.4th at p. 446.) First, the defendant must have *purposefully availed* itself of the state's benefits. Second, the controversy must be *related to or arise out of* the defendant's contacts with the state. (*Ibid*.) Third, considering the defendant's contacts with the state and other factors, California's exercise of jurisdiction over the defendant must comport with *fair play and substantial justice*. (*Id.* at p. 447.)" (*Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1567-1568 (*Gilmore Bank*).)

Appellant and her husband are California residents, and SOOG is a Chinese corporation. There is no evidence SOOG conducts substantial or continuous activities in California, so we focus our inquiry, as does appellant, on whether there are grounds for specific personal jurisdiction over the company. The trial court did not think there were such grounds. We respectfully disagree.

7

The first element for specific jurisdiction is purposeful availment of the state's benefits. Because we are dealing with a nonresident corporate defendant, we must distinguish between actions of the corporation directed at California and the actions of its agents, employees, directors, and officers, including Shi Che or Zhiyuan Che, directed at California. Appellant argues jurisdiction over SOOG is appropriate because the Ches were its agents and they had minimum contacts with California through their ownership of the Cortland property. We agree with the panel in *Anglo Irish Bank* that such "reliance on state substantive law of agency and alter ego to determine the constitutional limits of specific personal jurisdiction is unnecessary and is an imprecise substitute for the appropriate jurisdictional question. The proper jurisdictional question is not whether the defendant can be liable for the acts of another person or entity under state substantive law, but whether the defendant has purposefully directed its activities at the forum state by causing a separate person or entity to engage in forum contacts. That constitutional question does not turn on the specific state law requirements of alter ego or agency, although the inquiry may be similar in some circumstances." (*Anglo Irish Bank, supra,* 65 Cal.App.4th at p. 983, fn. omitted.)[9]

Of course, "corporations by their nature can only operate through their appointed agents," and thus "courts consistently exercise personal jurisdiction over corporations based upon their agents' activities within the forum state." (*Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 535.) But this does not mean any activity by an agent in the forum state automatically results in personal jurisdiction over the corporation. Instead, "activities that are undertaken on behalf of a [corporate] defendant may be attributed to that defendant for purposes of personal jurisdiction if the

---

[9] The evidence here paints a picture of a company operated as little more than the personal slush fund of the Ches, at least as far as the subject transaction goes. So while it does not dispose of the jurisdictional question, appellant's assertion of alter ego does appear to have some evidentiary basis.

8

defendant purposefully directed those activities toward the forum state." (*Anglo Irish Bank*, *supra*, 165 Cal.App.4th at p. 981.)

Shi Che has repeatedly admitted in sworn declarations that the actions he, Zhiyuan Che, and Chamroen Chetty took in this transaction were done on SOOG's behalf. Acting as SOOG's president, Shi Che contacted appellant's husband repeatedly in July 2017 to negotiate the terms of a loan. Once hammered out, appellant signed the loan agreement and her husband brought it to Shi Che in China, who signed and stamped it as an officer of SOOG, not in his individual capacity. At Shi Che's direction, appellant wired the loan proceeds out of her California bank account, and Zhiyuan Che received the loan monies into his Chinese bank account on SOOG's behalf. The interest payments on the loan were transferred from Zhiyuan Che to appellant and her daughter in their California bank accounts. SOOG, through its agents, purposefully directed activity at California.

To be sure, it is not enough for a nonresident to enter into a contract with a California resident in order to establish jurisdiction. (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 572.) The United States Supreme Court has instead "emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' [Citation.] It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." (*Burger King, supra,* 471 U.S. at p. 479.)[10] But using the foregoing analysis, it is clear the loan agreement was the culmination of ongoing activity directed by SOOG at the forum.

---

[10] We grant judicial notice of published federal court decisions as requested by appellant, including *International Shoe* and others. (See Evid. Code, § 451(a).)

SOOG repeatedly uses the word "passive" to describe the loan transaction, as if it one day discovered, to its great surprise, that it had borrowed money from appellant that needed to be repaid. But the record shows otherwise. SOOG initiated contact with appellant's husband to request the loan from appellant, repeatedly corresponded with him to negotiate terms, and orchestrated the disbursement of funds. At the time the loan was being negotiated and formalized, appellant understood that the loan monies would be used for both personal and business purposes by Shi Che and his family members. SOOG's connection with California was not tangential. It sought funding in California, received it from California, and then, according to appellant, made interest payments in California.

This case is thus different from *Elkman v. National States Ins. Co.* (2009) 173 Cal.App.4th 1305 (*Elkman*), on which SOOG relies. In *Elkman*, a Missouri insurer did not purposefully direct its activities toward California just by receiving insurance premium payments from an insured who moved here from Florida. (*Id.* at pp. 1309, 1321.) The court observed: "National did not 'come here' voluntarily, no matter how many insureds did. It was the unilateral decisions of Elkman and other insureds to relocate to California which caused National to accept payments from this state and to process and pay claims for services rendered in this state. These circumstances do not support a finding National purposefully availed itself of forum benefits so as to make it subject to specific jurisdiction in California." (*Id.* at p. 1321, fn. omitted.) Indeed, the word "passive" is better used to describe the activity of the defendant in *Elkman*, rather than that of SOOG. Appellant did not move to California after the agreement was consummated. She was already here, and SOOG and its representatives pursued her here for financing. They could expect to be haled into court here for claims relating to the loan.

10

This takes us to the second element of the specific jurisdiction test, which requires no discussion. There is no question the present lawsuit stems from SOOG's breach of the loan agreement.

As to the third element, we must determine whether exercising jurisdiction over SOOG in this case would be fair and reasonable. (See *Gilmore Bank*, *supra*, 223 Cal.App.4th at p. 1574.) To assess this, "[c]ourts may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies."' (*Burger King*, *supra*, 471 U.S. at p. 477.)" (*Vons*, *supra*, 14 Cal.4th at p. 448.)

SOOG submitted no evidence to the trial court regarding the burden required to litigate in California. However, the Ches averred in declarations that China's strict border policy in the wake of the COVID-19 pandemic makes it very difficult for them to travel to the United States. The record leaves us unable to discern whether this border policy has changed since the declarations were signed in 2022, but as we noted in *Gilmore Bank*, "'modern advances in communications and transportation have significantly reduced the burden of litigating in another country.' (*Sinatra v. National Enquirer, Inc.* (9th Cir. 1988) 854 F.2d 1191, 1199.)" (*Gilmore Bank*, *supra*, 223 Cal.App.4th at p. 1575.) China's border policy alone, whatever it may currently be, does not prevent SOOG from participating in the litigation. In its brief on appeal, SOOG raises the possibility of language barriers, high costs of counsel, and witnesses located in China. We acknowledge language barriers are less likely to be an issue for the parties in China, but our courts are also equipped with language access services to assist those litigants who may be less proficient in English. SOOG does not identify any witnesses located in China aside from the Ches, and clearly the Ches are already familiar with California, having owned property here.

11

Furthermore, the only out-of-state witnesses identified are the Ches. "This is not a case which should require testimony from a large number of witnesses located in a faraway state." (*Checker Motors Corp. v. Superior Court* (1993) 13 Cal.App.4th 1007, 1021-1022.)

SOOG further contends a United States judgment would not be recognized or enforced in China. No authority or support is offered for this proposition so we must disregard it. SOOG also claims Chinese witnesses are prohibited from testifying in a foreign court. In its briefing below, it cited to *unpublished* federal district court cases in which, SOOG claimed, the trial court excused Chinese witnesses from being deposed remotely from China as such testimony might subject them to prosecution under Chinese law.[11]

Unpublished federal opinions may be cited and have persuasive authority. (See *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18.) But upon examination, these cases do not support the point SOOG seeks to make. In *Zhizheng Wang v. Hull* (W.D. Wash. June 22, 2020, No. C18-122ORSL) 2020 U.S. Dist. LEXIS 108944, the plaintiff was located in China, and the American defendants wished to depose him on video in China. (*Id*. at *1-*2.) Defendant's counsel discovered that Article 277 of the Chinese Civil Law does not permit foreign authorities to obtain evidence within China unless such efforts are coordinated through international treaties to which China is a party. (*Id*. at *2.) Defendant moved to compel plaintiff's deposition when plaintiff refused to make any other arrangements for the deposition that would comply with Article 277. (*Ibid.*) Under this circumstance, the federal district court in Seattle agreed that defendant should be able to take the deposition in a manner that would not expose himself or his attorneys to criminal prosecution. (*Id.* at *3-*5.) Similarly, the federal district court in *Junjiang Ji v. Jling Inc*. (E.D.N.Y. Mar. 31, 2019, No. 15-CV-

---

[11] In its brief before this court, SOOG cites no authority at all for its claim that Chinese witnesses are forbidden to testify in foreign courts.

4194 (SIL)) 2019 U.S. Dist. LEXIS 55341, struck video testimony given by the plaintiff while in China because it exposed him and those examining him to criminal prosecution in China. The court noted that "by testifying via video link while located in mainland China, Ji violated Article 277 of the Chinese Civil Law. By participating in those proceedings, Defendants' counsel and potentially all other parties involved violated Article 15 of the Regulations and, thus, could be fined under Article 30. Further, these violations potentially subjected the participating parties to deportation from China under Article 81 of the Administration Law as well as criminal liability under Article 13 of the Chinese Criminal Law." (*Id.* at \*33-\*34.) Nowhere in these cases is it stated that Chinese witnesses are prohibited by Chinese law from testifying in a foreign court, as SOOG asserts. The laws in question apply only when witnesses are located within mainland China, and indeed, they suggest witnesses *may* participate in foreign proceedings even within China, provided the proper channels are followed.

California has a significant interest in the present dispute, perhaps more than China. The funds at issue in this case were transferred from California, and ended up in a Chinese bank account. California has an interest in ensuring its residents are repaid when they loan funds to parties outside California.

Appellant, as a California resident, would definitely achieve more convenient relief in a California court, but whether it would be effective is subject to some doubt. SOOG is a Chinese company and it says all of its assets are located in China. To execute on those assets to repay a judgment, appellant would have to take her judgment to a Chinese court and attempt to enforce it. We have no way of knowing how difficult or easy this process would be, but appellant would be the one undertaking it, and she does not seem fazed by it. For all of these reasons, the exercise of jurisdiction over SOOG in this case would be fair and reasonable.

13

## II.        Forum Non Conveniens and Forum Selection Language

SOOG further argues we should affirm the trial court's order because its alternate theories of forum non conveniens and forum selection warrant dismissal. We acknowledge the "settled appellate principle that if a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning." (*Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1192-1193.) But the principle is not applicable here. For one thing, forum non conveniens would not warrant dismissal here. And SOOG's second theory, forum selection, was not considered thoroughly by the trial court.

### A.        Forum Non Conveniens

Code of Civil Procedure section 410.30 "codifies the common law doctrine of forum non conveniens. (*National Football League v. Fireman's Fund Ins. Co.* (2013) 216 Cal.App.4th 902, 923 [(*NFL*)].) '[E]quitable' at its core, the doctrine recognizes a trial court's authority to determine an 'action may be more appropriately and justly tried elsewhere.' (*Stangvik v. Shiley Inc.* (1991) 54 Cal.3d 744, 751 . . . .) The trial court is vested with broad discretion to apply the doctrine (*ibid.*), and this discretion 'widens when it imposes a stay rather than a dismissal.' ([*NFL*], at p. 918, fn. 7.) '[I]n considering a stay the trial court can take into account any consideration which bears on the relative suitability or convenience of the two forums.' (*Century Indemnity Co. v. Bank of America* (1997) 58 Cal.App.4th 408, 412 . . . .)" (*St. Paul Fire & Marine Ins. Co. v. AmerisourceBergen Corp.* (2022) 80 Cal.App.5th 1, 13.)

Dismissal is a different matter. "Except in extraordinary cases, a trial court has no jurisdiction to dismiss an action brought by a California resident on the grounds of forum non conveniens. (*Archibald v. Cinerama Hotels* [(1976)] 15 Cal.3d [853,] 858.) 'This limitation of the *forum non conveniens* doctrine does not rest on any conclusion derived from a balancing of conveniences; it reflects an overriding state policy of assuring California residents an adequate forum for the redress of grievances.' (*Id.* at p.

14

859.) When the trial court stays the action, rather than dismissing it, the court retains jurisdiction to "'compel the foreign [party] to cooperate in bringing about a fair and speedy hearing in the foreign forum; it can resume proceedings if the foreign action is unreasonably delayed or fails to reach a resolution on the merits. . . . In short, the staying court can protect . . . the interests of the California resident pending the final decision of the foreign court. '" (*Id.* at p. 857.) In light of the policy of assuring an adequate forum for the California resident, 'the exceptional case which justifies the dismissal of a suit under the doctrine of *forum non conveniens* is one in which California cannot provide an adequate forum or has no interest in doing so.' (*Id.* at p. 859, fn. omitted.)" (*Van Keulen v. Cathay Pacific Airways, Ltd.* (2008) 162 Cal.App.4th 122, 129-130.) This is no such exceptional case. At best, forum non conveniens provides a reason for the trial court to stay the lawsuit, not dismiss it. On remand, the trial court should consider whether a stay based on forum non conveniens is appropriate.

### B.        Forum Selection

SOOG also points to language in the loan agreement stating: "Disputes arising from the performance of this agreement shall be resolved through negotiation between the parties. If the negotiation fails, the parties agree to resolve the dispute by filing a lawsuit with the people's court where the agreement is signed." According to SOOG, "the people's court" ordinarily refers to Chinese courts, and the parties thus intended to settle their disputes in China rather than in California. This argument is undermined by the immediately following phrase, "where the agreement is signed." As noted above, one party to the agreement signed in California, the other in China.

By designating a forum for their disputes, the parties arguably made a choice where they would like the dispute to be heard.[12] This choice of forum, however, does not mean other courts lack jurisdiction, and it is certainly not dispositive of the

_____

[12]        We say "arguably" because it is difficult to understand from the agreement what venue was actually designated.

15

jurisdictional question. "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.) The parties' agreement cannot eliminate jurisdiction where it exists. Rather, as our Supreme Court stated in *Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 495: "courts possess discretion to *decline* to exercise jurisdiction in recognition of the parties' free and voluntary choice of a different forum." "However, a distinction has been drawn between a mandatory and a permissive forum selection clause for purposes of analyzing whether the clause should be enforced. A mandatory clause will ordinarily be given effect without any analysis of convenience; the only question is whether enforcement of the clause would be unreasonable. On the other hand, when the clause merely provides for submission to jurisdiction and does not expressly mandate litigation exclusively in a particular forum, then the traditional forum non conveniens analysis applies." (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 196.)

The language in this agreement is unclear and requires factual findings by the trial court. The term "people's court" in the context of the document could mean multiple things.[13] There is certainly conflicting evidence in the record as to what the parties understood it to mean. Shi Che, of course, stated he thought China was the selected forum for disputes. Appellant stated she thought "people's courts" referred to California courts. And none of this addresses the question of whether the language is permissive or mandatory. As a reviewing court, we are in no position to resolve the ambiguity and decide where the parties agreed to litigate.

Because the forum non conveniens and forum selection issues were not addressed in the initial ruling, we remand so the trial court can properly consider them.

---

[13] The closest thing to evidence the trial court received was opinions from SOOG's lawyers at the hearing on their motion.

16

## DISPOSITION

The judgment dismissing respondent Shandong Oriental Ocean Group Co., Ltd. from the above entitled action based on lack of personal jurisdiction is reversed and remanded to the trial court for consideration of the forum non conveniens and forum selection issues raised in respondent's motion to quash summons. Appellant to recover her costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

GOODING, J.

17